NICHOLS et al., Appellants,

v.

HANZEL et al., Appellees.

[Cite as *Nichols v. Hanzel* (1996), 110 Ohio App.3d 591.]

Court of Appeals of Ohio,
Fourth District, Scioto County.

No. 94CA2316.

Decided April 26, 1996.

*Weisman, Goldberg & Weisman Co., L.P.A.,* and *Benito C.R. Antognoli,* for appellants.

*Bannon, Howland & Dever* and *Robert E. Dever,* for appellees.

KLINE, Judge.

Plaintiffs-appellants William and Linda Nichols filed a complaint in the Scioto County Court of Common Pleas against defendants-appellees David B. Hanzel, M.D. and Don R. Gilman, D.O. alleging medical malpractice.[1] After the conclusion of appellants' case, the trial court granted appellees' motion for a directed verdict. Appellants appeal from this judgment and assign the following errors:

"I. The lower court erred in refusing to allow James J. Nordlund, M.D. to testify with regards to the issue of the proximate cause of the injury suffered by the plaintiff-appellant, William Nichols.

"II. The lower court erred in granting the defendant-appellees' motion for directed verdict.

"III. The lower court erred in failing to state the basis upon which it granted the defendant-appellees' motion for directed verdict."

---

1. In the Scioto County Court of Common Pleas, this case was styled *William Nichols et al. v. Family Medi–Center et al.* Family Medi–Center was voluntarily dismissed because the name identifies the office location shared by appellees Dr. David B. Hanzel and Dr. Don R. Gilman rather than an existing corporation or partnership. The case proceeded against Dr. Hanzel and Dr. Gilman.

A review of the record reveals the following pertinent facts. Appellees own and operate separate medical practices at a location known as the Family Medi-Center. Although each physician maintains his own practice, it is common for each of them to see the other's patients when the other is not available.

In January 1990, appellant William Nichols went to see appellee Hanzel at the Family Medi-Center. Nichols complained about a groin muscle pulled by lifting a large piece of steel at work and a rash on his side and back. Nichols testified that the rash did not itch, was not raised or blistered, and that it did not bother him except for the fact that it was there. Hanzel diagnosed Nichols's rash as allergic dermatitis and gave Nichols topical cream to treat the rash. Nichols applied the cream, and the rash went away.

When Nichols finished using all of the topical cream, the rash returned. On July 17, 1990, Nichols returned to the Family Medi-Center for treatment of the rash. Because Hanzel was not available, appellee Gilman treated Nichols. The rash was now located on Nichols's stomach and back. Gilman diagnosed Nichols's rash as urticaria, which is a different disease from allergic dermatitis, but the doctors used the terms interchangeably. Gilman prescribed Medrol Dosepak, which is a systemic corticosteroid. Gilman did not discuss the side effects of corticosteroids with Nichols, but Nichols took the medication and the rash disappeared.

When the Medrol ran out, the rash returned over a greater area. Nichols again saw Gilman, who prescribed a course of Prednisone, another systemic corticosteroid, for the rash. Gilman did not advise Nichols of the side effects of Prednisone, nor did he discuss alternative treatments for the rash. On four subsequent occasions, appellee Hanzel renewed the Prednisone prescription for Nichols by phone without speaking to Nichols or requiring Nichols to come to the office. Hanzel testified that he deviated from his office policy of requiring patients to come into the office because Nichols worked out of town. Hanzel never advised Nichols of the side effects of Prednisone, discussed alternative treatments, or consulted with Gilman about Nichols's treatment.

Nichols returned to the Family Medi-Center on November 4, 1991 complaining of extreme pain in his legs when he walked. The treatment of Nichols's leg pain continued on November 11 and December 3, 1991. Hanzel eventually referred Nichols to the Cleveland Clinic for evaluation.

On February 21, 1992, Nichols went to the Cleveland Clinic for his leg pain, and Dr. Peter Brooks diagnosed Nichols with osteonecrosis of both hips, which is the death of bone tissue, also known as avascular necrosis or aseptic necrosis. Under Brooks's care, Nichols underwent total hip replacement of both his left and right hips. Nichols testified that Brooks advised him that the osteonecrosis

of his hips was probably caused by the regimen of corticosteroids prescribed by appellees.

Appellants filed this malpractice suit, alleging that appellees failed to meet the appropriate standard of care in their treatment of Nichols and that the deviation from the appropriate standard of care was a direct and proximate cause of the osteonecrosis suffered by Nichols. Appellants alleged that appellees were jointly, severally, and/or concurrently liable for the permanent injuries to Nichols's hips.

At trial, appellants presented three expert witnesses to establish that appellees' negligent care of Nichols proximately caused Nichols's osteonecrosis. Dr. James J. Nordlund testified about the proper standard of care, and Drs. Hyman M. Stockfish and Peter Brooks testified about the proximate cause of Nichols's osteonecrosis. The relevant portions of each doctor's testimony will be reviewed with the appropriate assignment of error.

At the close of appellants' case, appellees moved for a directed verdict, arguing only that appellants failed to prove that appellees' treatment of Nichols proximately caused his osteonecrosis. After considering the motion and asking appellants' counsel several questions about how they would reconcile certain statements of the witnesses regarding causation, the trial court announced that the motion was granted. On October 20, 1994, the court filed a judgment entry stating that "[t]his Court having heard the arguments of counsel finds said motion to be well taken and the same is hereby sustained in its entirety." The trial court did not explain the basis for its judgment.

■ In their first assignment of error, appellants challenge the trial court's refusal to allow Dr. James J. Nordlund to testify about proximate cause. Appellees objected to the questions appellants asked Nordlund pertaining to the cause of Nichols's osteonecrosis on the basis of failure to qualify Nordlund as an expert in osteonecrosis or orthopedics, which involves the care and treatment of the bone and skeletal system. The trial court sustained appellees' objections to the following questions: whether Nordlund must consider the side effects of osteonecrosis in his practice as it related to the use of corticosteroids, whether Nordlund had ever treated patients who had taken corticosteroids and subsequently contracted osteonecrosis, and whether, in his teaching at the University of Cincinnati Medical School and the Yale Medical School, he taught the connection between osteonecrosis and the use of corticosteroids. After the objections to these questions were sustained, there was a bench conference at which the trial judge stated the following:

"Now, let the record show that if you want to attempt to establish [Dr. Nordlund's] medical history as an expert in some other field, you are free to endeavor to do that. We are not denying you that right.

" * * *

"But until such time as you qualify him as an expert, the—I'm not allowing him to answer the questions concerning something outside of his field."

Appellants then asked Nordlund whether he dealt with the issue of the side effects of corticosteroids in his practice of internal medicine. Appellees objected, and the court sustained the objection. Appellants did not ask Nordlund any further questions regarding causation.

Evid.R. 104(A) provides that "[p]reliminary questions concerning the qualification of a person to be a witness * * * shall be determined by the court * * *." The trial court is therefore vested with broad discretion in its determination of the competency of an expert witness, and the court's ruling on this matter will not be reversed absent an abuse of that discretion. *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 157, 10 O.O.3d 332, 333, 383 N.E.2d 564, 565, citing *Ohio Turnpike Comm. v. Ellis* (1955), 164 Ohio St. 377, 58 O.O. 179, 131 N.E.2d 397, paragraph eight of the syllabus. An abuse of discretion involves more than an error of judgment; it connotes an attitude on the part of the court that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482–483, 450 N.E.2d 1140, 1142, citing *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 172–173, 404 N.E.2d 144, 148. When applying the abuse of discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301, 1308–1309.

Evid.R. 702 provides that a witness may testify as an expert if the following three conditions are met: (1) he or she is qualified as an expert by virtue of specialized knowledge, skill, experience, training or education regarding the subject matter of the testimony; (2) the testimony relates to matters beyond the knowledge or experience of lay persons or dispels a common misconception among lay persons; and (3) the testimony is based upon reliable scientific, technical, or other specialized information. The qualification of an expert depends upon the expert's possession of special knowledge that he or she has acquired either by study of recognized authorities on the subject or by practical experience that he or she can impart to the jury and that will assist the jury in understanding a pertinent matter. *State Auto Mut. Ins. Co. v. Chrysler Corp.* (1973), 36 Ohio St.2d 151, 160, 65 O.O.2d 374, 379, 304 N.E.2d 891, 897. Furthermore, it must appear that the expert has an opinion of his or her own or is able to form one upon the matter in question. *Id.*

The expert witness is not required to be the best witness on the subject, but his or her testimony must assist the trier of fact in the search for the truth. *Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d at 159, 10 O.O.3d at 334, 383

N.E.2d at 566–567. Furthermore, the expert witness does not have to specialize in the same field as the defendant physician so long as it is shown that the fields of medicine practiced by the expert and the defendant overlap and that more than one type of specialist may perform the relevant treatment. *Id.* at 158, 10 O.O.3d at 333–334, 383 N.E.2d at 566. "[I]t is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of [the witness's] qualifications." *Id.* at 160, 10 O.O.3d at 334–335, 383 N.E.2d at 567.

Nordlund is board-certified in both internal medicine and dermatology. Despite the trial court's instruction to appellants that they must demonstrate how Nordlund was qualified to testify about the cause of osteonecrosis, appellants did not establish that Nordlund's specialties related to osteonecrosis or the study of orthopedics. Appellants' proffer indicated only that the evidence would show that Nordlund was qualified to testify about the cause of osteonecrosis and that he would testify that Nichols's osteonecrosis was caused by the steroids prescribed by appellees. Appellants did not show that Nordlund had any specialized knowledge of osteonecrosis besides his awareness that the disease is among the possible side effects of the use of corticosteroids. Appellants also did not show that the fields of dermatology or internal medicine overlap orthopedic medicine or that Nordlund received education or training in orthopedics. This court concludes that the trial court did not abuse its discretion by sustaining appellees' objections to questions that did not qualify Nordlund to testify about causation. We therefore overrule appellants' first assignment of error.[2]

■ In their second assignment of error, appellants assert that the trial court erred by granting appellees' motion for a directed verdict. Many courts have considered the propriety of granting a directed verdict in medical malpractice cases. In order to prove a cause of action for medical malpractice, the plaintiff must show by a preponderance of the evidence (1) that the injury complained of was caused by an act that a physician or surgeon of ordinary skill, care and diligence would not have performed under similar circumstances, or by the failure or omission to act as a physician or surgeon would have done under similar circumstances; and (2) that the injury complained of was the direct and proximate result of such act or omission. *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673, paragraph one of the syllabus; *Berdyck v. Shinde* (1993), 66 Ohio St.3d 573, 579, 613 N.E.2d 1014, 1021, citing *Bruni*. In this case, Nordlund and Stockfish testified that the treatment rendered to Nichols by both appellees fell below the applicable standard of medical care, and appellees did not

---

2. We note that appellees did not object to Stockfish's testimony concerning proximate cause although his field of practice is also internal medicine, and it is not clear that Stockfish is more specially qualified in orthopedics than Nordlund.

dispute this testimony for the purpose of their motion for directed verdict. Rather, appellees challenged whether appellants presented evidence that Nichols's injury was the direct and proximate result of appellees' alleged failure to use appropriate care.

Civ.R. 50(A)(4) provides as follows:

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

Although a motion for directed verdict requires a trial court to review and consider the evidence, the motion does not present a question of fact or raise factual issues. *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 23 O.O.3d 115, 430 N.E.2d 935, paragraph one of the syllabus. A motion for a directed verdict tests the legal sufficiency of the evidence rather than its weight or the credibility of the witnesses. *Ruta v. Breckenridge–Remy Co.*, 69 Ohio St.2d at 68–69, 23 O.O.3d at 116–117, 430 N.E.2d at 937–938; *Eldridge v. Firestone Tire & Rubber Co.* (1985), 24 Ohio App.3d 94, 96, 24 OBR 164, 165–166, 493 N.E.2d 293, 295. A motion for a directed verdict therefore presents a question of law, and an appellate court conducts a *de novo* review of the lower court's judgment. *Howell v. Dayton Power & Light Co.* (1995), 102 Ohio App.3d 6, 13, 656 N.E.2d 957, 961; *Keeton v. Telemedia Co. of S. Ohio* (1994), 98 Ohio App.3d 405, 409, 648 N.E.2d 856, 858–859.

In medical malpractice cases, expert medical testimony is necessary to establish the causal connection between the negligence and the injury whenever this relationship is beyond the common knowledge and understanding of the jury. *Berdyck v. Shinde,* 66 Ohio St.3d at 579, 613 N.E.2d at 1021, citing *Bruni v. Tatsumi,* 46 Ohio St.2d at 131–132, 75 O.O.2d at 186–187, 346 N.E.2d at 677–678; *Cooper v. Sisters of Charity of Cincinnati, Inc.* (1971), 27 Ohio St.2d 242, 253, 56 O.O.2d 146, 152, 272 N.E.2d 97, 104. A trial court considering a motion for a directed verdict on the issue of proximate cause in a medical malpractice case must apply Civ.R. 50(A)(4) in the following manner: "Where there is competent expert testimony, based on reasonable medical probability, that the negligent acts of a physician were the direct and proximate cause of the patient's [injury], a trial court correctly denies a motion for directed verdict on the issue of proximate cause." *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 592 N.E.2d 828, paragraph four of the syllabus. See, also, *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896, paragraph four of

the syllabus. Whether a directed verdict as to the issue of proximate cause should be granted depends on the totality of the medical testimony given by the expert witnesses and any reasonable inferences that may be drawn therefrom. *Bailey v. Emilio C. Chu, M.D., Inc.* (1992), 80 Ohio App.3d 627, 635, 610 N.E.2d 531, 536–537. The expert witness must express his or her opinion in terms of probability; otherwise the testimony will be excluded as speculative. *Shumaker v. Oliver B. Cannon & Sons, Inc.* (1986), 28 Ohio St.3d 367, 369, 28 OBR 429, 430–431, 504 N.E.2d 44, 46–47.

■ To establish that the negligence of appellees proximately caused Nichols's osteonecrosis, appellants presented the testimony of Hyman M. Stockfish and Peter Brooks. Stockfish is a board-certified practitioner of internal medicine. Stockfish uses Prednisone in his practice but does not treat patients with osteonecrosis. Stockfish testified that appellees did not meet the applicable standard of care and that, based on his training and experience, his opinion to a reasonable degree of medical certainty was that the proximate cause of Nichols's osteonecrosis was an excessive use of steroids in a relatively short period of time. On cross-examination, Stockfish acknowledged that smoking and alcohol consumption, both of which Nichols engaged in, might also cause osteonecrosis. Although Stockfish maintained that the most common cause is steroid overdose, he recognized that no one knows definitively what causes osteonecrosis. Stockfish also stated that he did not know how much of the corticosteroids would have been necessary to cause Nichols's condition. A portion of Stockfish's testimony on cross-examination reads as follows:

"Q. * * * [Y]ou—have said that they give [one thousand milligrams a day doses of Prednisone] on frequent occasions and years go by and there is no aseptic necrosis, and I said you don't have anything to dispute that?

"A. True, because nobody knows what causes it.

"Q. Aseptic necrosis?

"A. Right. * * *"

Furthermore, on recross examination, Stockfish testified as follows:

"Q. And isn't it a fact that it's the continuous steroids over a long period that we discussed in the literature that is thought to cause aseptic necrosis?

"A. That's the word. The word is 'thought.' I don't know.

"Q. And you don't know anything about that, do you?

"A. I don't know any more than they do or you do or anybody else in this room. I don't know and nobody knows and—

"Q. So you have to speculate when you go beyond that; isn't that true? Everybody does.

"A. As I said, if I don't know what's causing it, I'm speculating."

Stockfish stated that he would not rule out the possibility that Nichols contracted osteonecrosis before the steroids. Furthermore, Stockfish stated that he had no opinion to a reasonable degree of medical certainty whether the individual dosages of steroids prescribed by appellee Gilman could cause osteonecrosis.

Appellants also presented the testimony of Brooks, an orthopedic surgeon and the physician who diagnosed appellee with osteonecrosis. Brooks testified that there are many conditions associated with osteonecrosis, including alcohol, but that he believed that Nichols's osteonecrosis was "causally related to the course of Prednisone that he received in the Summer and Fall of 1990." On cross-examination, Brooks conceded that he did not use corticosteroids except in emergencies, and that he was not aware of the recommended dosages, although he assumed that Nichols's individual dosages were acceptable. Brooks testified that any amount of steroids might cause osteonecrosis, and he did not know which dosage was responsible for Nichols's condition. However, Brooks also reiterated his belief that Nichols was prescribed more than enough dosages to cause osteonecrosis. Although he did not rule out alcohol as a cause, he believed that Prednisone was a greater risk factor. On redirect examination, Brooks stated that he would rule out alcohol because of the time relationship between the steroid use and the onset of the disease.

Appellants assert that, construing the evidence most strongly in their favor, the testimony of Stockfish and Brooks was sufficient to withstand appellees' motion for a directed verdict pursuant to Civ.R. 50(A)(4). Appellees counter that the experts' direct testimony indicating that the osteonecrosis was proximately caused by the steroids prescribed by appellees was contradicted and negated during cross-examination. Specifically, Stockfish testified that no one knows what causes osteonecrosis, that he would not rule out the possibility that Nichols had osteonecrosis before taking the steroids prescribed by appellees, and that he did not know how the corticosteroids prescribed to Nichols affected him because no one knows what amount of steroids causes osteonecrosis. Brooks testified that he would not rule out alcohol as a cause of Nichols's osteonecrosis.

The Lake County Court of Appeals considered a witness's conflicting testimony in *Galletti v. Burns Internatl.* (1991), 74 Ohio App.3d 680, 684, 600 N.E.2d 294, 297 (Christley, P.J., concurring):

"Once an expert properly states his professional opinion to a properly formed question as to 'probability,' he or she has established a prima facie case as a

matter of law. Erosion of that opinion due to effective cross-examination does not negate that opinion, rather it only goes to weight and credibility. Thus, it would not usually be a suitable instance for application of a directed verdict. The exception would be when the expert actually recants the opinion on cross."

The majority in *Galletti* and other courts have agreed that a party moving for a directed verdict must show that the testimony was resolved in its favor by a direct contradiction or negation of the testimony given by the witness on direct examination. If no such contradiction or negation is shown, the testimony given on cross-examination only arouses speculation regarding the witness's testimony on direct and leaves a question of fact for the jury to determine. *Id.* See, also, *Shapiro v. Burkons* (1978), 62 Ohio App.2d 73, 83–84, 404 N.E.2d 778, 784–785.

This court concedes that Stockfish's testimony on cross-examination calls into question his opinion that the corticosteroids caused Nichols's osteonecrosis. It is indeed curious that the doctor was certain within a reasonable degree of medical certainty that the corticosteroids prescribed by appellees caused Nichols's osteonecrosis when he did not believe that anyone actually knows what causes osteonecrosis. Nevertheless, Stockfish maintained on redirect examination that it was his opinion that Nichols's osteonecrosis was caused by the excessive use of corticosteroids in a short period of time.

Furthermore, although Brooks opined that alcohol might be a cause of Nichols's osteonecrosis, he later ruled that option out on redirect examination due to the time relationship of the steroid use and the onset of Nichols's condition. Brooks reiterated his belief that corticosteroid use is a stronger risk factor than alcohol. The fact that Brooks was unable to say which dosage of steroids caused the disease does not diminish his statement that any one or more of the doses prescribed by appellees caused the osteonecrosis. Accordingly, this court does not find that the testimony of appellants' witnesses was negated or directly contradicted on cross-examination so as to eliminate the possibility that reasonable minds may reach different conclusions about the cause of Nichols's osteonecrosis.

Appellees further attempt to support the trial court's judgment on the grounds that appellants failed to establish whether both appellees or, if not both, which one proximately caused Nichols's condition. Specifically, Stockfish testified that he had no opinion to a reasonable degree of medical certainty whether Gilman's prescription caused the osteonecrosis, and Brooks testified that he did not know which dosage caused the condition.

Appellants counter that a showing of exactly which prescription caused Nichols's injury is not necessary when they have alleged joint and several liability.

"Where two or more causes combine to produce such a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about the harm, the courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm." 2 Restatement of the Law 2d, Torts (1965) 440, Section 433A, Comment *i*; see, also, *Pang v. Minch* (1990), 53 Ohio St.3d 186, 196–197, 559 N.E.2d 1313, 1323.

The individuals causing the injury need not act in concert and may owe separate and distinct duties that are not identical in character or scope. *Id.* The criterion for joint and several liability is indivisibility of harm, not the indivisibility of causation. *Pang v. Minch*, 53 Ohio St.3d at 197, 559 N.E.2d at 1323–1324. Once the plaintiff produces evidence that the conduct of each defendant was a substantial factor in producing the single injury, a prima facie evidentiary foundation has been established supporting joint and several judgments against the defendants. *Id.* Thereafter, the burden shifts to the defendants to demonstrate that the harm produced by their separate tortious acts is capable of apportionment. *Id.*

In this case, Nordlund and Stockfish testified that both appellees failed to act within the proper standard of care. Stockfish and Brooks then testified that appellees' negligence proximately caused Nichols's injury. Appellants are not required to establish precisely which action of appellees caused the harm. Appellants' witnesses were unable to logically divide Nichols's injury, and none of the experts eliminated either of appellees as a cause of the osteonecrosis. Appellants have therefore produced evidence supporting joint and several judgments against appellees sufficient to withstand the motion for directed verdict.

After construing the evidence most strongly in favor of appellants pursuant to Civ.R. 50(A)(4), this court finds that reasonable minds could come to different conclusions upon the evidence concerning the cause of Nichols's osteonecrosis. Having conducted a *de novo* review of the trial court's judgment, we conclude that the trial court erred by granting a directed verdict in favor of appellees, and we sustain appellants' second assignment of error.

In light of our disposition of appellants' second assignment or error, appellants' third assignment of error has been rendered moot. See App.R. 12(A)(1)(c). For all of the foregoing reasons, this court reverses the judgment of the trial court and remands this cause for proceedings consistent with this opinion.

*Judgment reversed
and cause remanded.*

HARSHA and STEPHENSON, JJ., concur.