OPINION
Appellant, Safe Auto Insurance Co. ("Safe Auto") appeals from the judgment of the Ashtabula County Court of Common Pleas entered on October 30, 1998. Plaintiff-appellee Grace Davis ("Davis") filed a declaratory judgment action against her insurer, Safe Auto, on January 22, 1997, seeking compensation for injuries she sustained in an automobile accident under the uninsured motorist provision. The case was tried to a jury on October 29 and 30, 1998, solely on the issue of whether or not Davis's policy provided uninsured motorist coverage. A verdict was returned in favor of Davis. In a companion case, 99-A-0005, Davis is appealing the trial court's denial of prejudgment interest and attorney's fees. In the present case, Safe Auto appeals from the denial of its motion for a directed verdict and, also, the content of the jury instructions.
Davis was in an automobile accident on September 10, 1995, wherein she sustained severe injuries. Davis was in a coma for one month after the accident. Davis testified she had substantial memory "problems" as a result of the head injuries she sustained. She was a passenger in a car driven by Robbie Reece, which collided with a vehicle driven by John Woodworth. Both Reece and Woodworth were negligent, but, as a result of their lack of insurance, Davis sought compensation through her own insurance policy with Safe Auto.
On or about March 30, 1995, Davis contacted Safe Auto to purchase an automobile insurance policy. She called in response to one of Safe Auto's television commercials. The entire transaction was conducted over the telephone and through the mail. No "in person" meeting with an agent or representative of Safe Auto's ever took place. Davis's initial contact with Safe Auto was handled by a customer service representative named Christine Thompson. She took the application information over the phone, prepared a policy contract, and mailed it to Davis for the appropriate signatures.
Ms. Thompson had no independent recollection of her conversation with Davis due to the volume of customers she spoke with and the amount of time that elapsed between Davis's application and the litigation. She did testify regarding the standard procedure she followed when talking to a prospective customer and filling out an application. She testified that she knew she was obligated under the law to offer uninsured motorist coverage, that it was company policy to offer the coverage, and that she received commission payments based on how much coverage she sold. She testified that the application information she took over the phone was contemporaneously entered into a computer, and the computer directed what questions to ask, one by one. She also testified that when a customer rejected uninsured motorist coverage, she then had to explain to them that they must sign the rejection spaces on the application which they would be receiving in the mail. The application was sent with little red stickers attached indicating where Davis should sign. If a customer requested a policy without uninsured motorist coverage and subsequently did not sign the rejection boxes, the application could not be processed until the signatures were obtained.
The application Ms. Thompson prepared and mailed to Davis for signatures indicated under the "UM/UIM bodily injury" section that there would be "no coverage", and likewise, under the "Uninsured Motorists Property Damage" section it also indicated "no coverage." The signature sections were separated, in bold-faced type. The first, titled "REJECTION OF UNINSURED/UNDERINSURED MOTORISTS BODILY INJURY COVERAGES" was signed and dated by Davis. Directly underneath it, the next section was titled "REJECTION OF UNINSURED/UNDERINSURED MOTORISTS PROPERTY DAMAGE COVERAGE." Davis signed and dated that section as well. Underneath that, there was the applicant approval section, which stated in part, "I hereby certify that I have read and answered all the questions on this application," which Davis also signed and dated. The policy went into effect on April 4, 1995, and a declaration page was mailed to Davis on April 11, 1995. The declaration page stated that uninsured and underinsured coverage was "Rejected on Application." After that, Davis was billed monthly, and she paid her bills.
Davis was forty-three years old at the time she bought the policy. She testified she could not "read or spell that well at all," and that she dropped out of school after eighth grade. She testified that when she called and ordered the policy, she specifically asked to get uninsured motorist coverage. She testified, "I don't understand too much of the policy at all `cuz I really didn't read it." She testified her husband, who has since passed on, normally helped her to read and understand things. She also testified that when she received the policy she tried to read it but could not, that her husband, who was very ill, did inform her he had read it, and he did sign the "excluded driver" signature line. His signature was directly above the uninsured motorist rejection sections which she signed.
Davis testified that before she signed the application she called Safe Auto to discuss whether or not the policy included uninsured motorist coverage. Davis testified she was told she was getting coverage for uninsured motorists, that it would be in her best interest to sign where all the red stickers were, and that way she would be covered for everything. After this conversation, Davis signed the application, including both spaces for rejecting uninsured motorist coverage. She returned the policy with her down payment.
Davis testified she called again when she received a statement in August of 1995, with a higher premium. She called "wondering why it was higher." This was the "third" and final call Davis testified about. However, she had in fact called prior to this "third" call. On August 9, 1995, Davis called Safe Auto to switch the policy coverage from her 1981 Buick to her 1980 Dodge Diplomat. The "third" call she testified to was in fact her fourth call. Safe Auto customer service representative Angela Rodriguez-Glenn took the August 9th phone call. She testified that because Davis added a new vehicle to the coverage over the phone, she had to get uninsured motorist property damage coverage for the vehicle, because a rejection of that coverage could not be taken over the phone. For changes made by telephone, and thus for the added vehicle, Rodriguez-Glenn testified she had to include the property damage coverage. Uninsured motorist property damage coverage was added to the policy.
A new declaration page was generated and mailed, indicating the different vehicle covered and adding the uninsured motorist property damage coverage. Davis apparently had no recollection of the August 9th phone call and was surprised when she received a new, higher rate of billing. Eighteen dollars had been added to her biannual premium for the new coverage. Davis testified she called to ask why it was higher and if she was "still" covered for uninsured motorists. Davis testified they did not explain why she had a higher premium, but did tell her she had uninsured motorist coverage. Later, she testified that no one at Safe Auto ever explained to her uninsured motorist coverage or the potential consequences of rejecting it, although asking them about uninsured motorist coverage is almost the only thing she remembers about her several conversations with them.
On April 21, 1998, Davis filed a motion for summary judgment. Safe Auto filed their response and a cross-motion for summary judgment on May 22, 1998. In their cross-motion for summary judgment, Safe Auto argued that Davis' signing of the provision rejecting UM coverage was a valid rejection, absent evidence of duress, fraud, or misunderstanding in obtaining the signatures, citing Owens v. State Farm Mut. Auto. Ins. Co. (1996), 112 Ohio App.3d 200. They also argued that a party's ignorance of the contents of a contract which the party signed will not relieve the party of the effect of the contact, citing Muskovitz v. Sun Underwriter's Agency
(1913), 3 Ohio App. 422. Davis' fundamental argument was that she did not understand what she was signing, that consequently her rejection of UM coverage was not knowingly made, and therefore she was entitled to UM coverage as a matter of law.
 In its cross-motion for summary judgment, Safe Auto made no argument with respect to the admissibility of the parol evidence being offered by Davis to challenge the validity of the signed rejections of UM coverage, either on the basis of the parol evidence rule or the statute of frauds. The court, noting Davis' allegation that she made specific requests to be provided uninsured motorist coverage, and her allegation that she was specifically told she was receiving such coverage, denied Safe Auto's cross-motion for summary judgment on the grounds there was a question of fact as to whether or not a knowing waiver of UM coverage occurred.
The case was tried to a jury on the narrow issue of whether or not Davis expressly and knowingly rejected uninsured motorist bodily injury coverage. At the close of plaintiff's case, Safe Auto moved for a directed verdict, which was denied. After the close of all evidence, Safe Auto renewed its motion, which was also denied. Safe Auto also submitted to the court several proposed sections of jury instructions, which the court declined to incorporate into the jury instructions. The jury returned a verdict in favor of Davis, which was subsequently journalized by the court on October 30, 1998. Safe auto timely filed a notice of appeal, citing the following errors:
 "1. Whether the trial court erred in overruling defendant's motion for directed verdict.
 "2. Whether the trial court erred in failing to give the instructions of law as requested by defendant."
The basis of Davis' claim and argument is that she is entitled to uninsured motorists bodily injury coverage by operation of law because she did not knowingly reject such coverage. The Supreme Court of Ohio set forth the rule that uninsured motorist coverage can only be eliminated from an automobile liability insurance policy by an express (and knowing) rejection of such coverage.Abate v. Pioneer Mutual Cas. Co. (1970), 22 Ohio St.2d 161, paragraph one of syllabus. In the absence of an express rejection, uninsured motorist coverage is provided to the insured by operation of law. Id., paragraph two of syllabus. The court amplified this holding in Gyori v. Johnston Coca-Cola Bottling Group, Inc. (1996),76 Ohio St.3d 565, by adding the proviso that in order for the rejection to be expressly and knowingly made, the rejection must be in writing and must be received by the insurance company prior to the commencement of the policy year. Id., paragraph two of syllabus. Safe Auto did receive a written, and hence express, rejection of uninsured motorist coverages from Davis prior to the commencement of the policy. Davis contends that the rejection was not knowingly made because she could not read the policy nor understand it, and that prior to signing it she received a verbal assurance from Safe Auto that she was going to be covered for uninsured motorists. She claims she signed on that basis.
Turning to the standard of review for Safe Auto's first assignment of error, a motion for a directed verdict presents a question of law. An appellate court must conduct a de novo review of the trial court's judgment. Nichols v. Hanzel (1996), 110 Ohio App.3d 591, 599. "A motion for a directed verdict does not present a question of fact or raise factual issues, but instead presents a question of law, even though in deciding such a motion it is necessary to review and consider the evidence." Ruta v. Breckenridge-Remy Co. (1982),69 Ohio St.2d 66, paragraph one of syllabus. "In deciding a motion for a directed verdict, neither the weight of the evidence nor the credibility of the witnesses is to be considered. Strother v.Hutchinson (1981), 67 Ohio St.2d 282, 284, * * *. Instead, `[w]hen a motion for a directed verdict is entered, what is being tested is a question of law; that is, the legal sufficiency of the evidence to take the case to the jury.' Ruta v. Breckenridge-Remy Co. (1982),69 Ohio St.2d 66, 68, * * *. The motion for directed verdict must be denied `if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions.' Hawkins v. Ivy (1977),50 Ohio St.2d 114, 115, * * *." (Parallel citations omitted.) Caterv. Cleveland (1998), 83 Ohio St.3d 24, 33.
While there was sufficient evidence going to the narrow issue the jury was asked, whether or not Davis `knowingly' rejected uninsured motorist coverage, a question of law that arises is whether or not Davis' testimony on this issue was competent parol evidence. In the instant case, Davis is asking to be released from the effect of her express rejection of coverage on the basis of parol evidence she offered by way of testimony. The contract terms at issue have never been challenged on the grounds they are ambiguous. If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241,245-246. If the intent of a written agreement is plain on its face, it is not necessary or permissible to resort to rules of construction or parol evidence to determine its effect. Gans v. Andrulis (Apr. 3, 1998), Portage App. 97-P-0043, unreported, at 11, citing InlandRefuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.
(1984), 15 Ohio St.3d 321, 324. No allegation has been made that Safe Auto's policy language was ambiguous. Safe Auto's policy application section for rejection of UM/UIM bodily injury coverage was set forth as follows:
 REJECTION OF UNINSURED/UNDERINSURED MOTORISTS BODILY INJURY COVERAGES
 I UNDERSTAND THAT THE STATE OF OHIO REQUIRES THAT THE UNINSURED/UNDERINSURED COVERAGES BE AFFORDED ME UNDER MY MOTOR VEHICLE LIABILITY POLICY UNLESS I SPECIFICALLY REJECT THESE COVERAGES. BY SIGNING BELOW, I REJECT THESE COVERAGES AND DIRECT THE COMPANY TO ISSUE MY POLICY WITHOUT SAID COVERAGES.
 DATE SIGNATURE OF APPLICANT
This document speaks for itself, and Davis did sign it, which would normally preclude the admission of parol evidence to contest its effect. However, the trial court, as a result of its ruling on Safe Auto's motion for summary judgment, in effect determined that testimonial evidence would be admitted on the question of whether or not the waiver of UM coverage was knowingly made, without any legal analysis regarding the competency of parol evidence to challenge the unambiguous terms of a written contract. In the instant case, Safe Auto did not challenge Davis' testimony on the grounds that it was inadmissible parol evidence.
In any case, an exception to the rule is that parol evidence is admissible in instances where the party claiming not to be bound by a term of a contract alleges they were induced to enter the contract by misrepresentations. Masternick v. Garrett (Dec. 10, 1999), Trumbull App. 98-T-0126, unreported, at 6. Unfortunately for Safe Auto, the statements Davis made about her conversations with Safe Auto's representatives are sufficient to meet the criteria of alleging a material misrepresentation. This court makes no determination whether Davis' statements were reliable, probative, or believable. The testimony did come in without objection and consequently there was sufficient evidence to survive a motion for a directed verdict. It constituted legally sufficient evidence to submit the case to the jury.
A second question is whether Davis should be bound to the terms of the contract as a matter of law simply because it was unambiguous and she did sign it. In Dice v. Akron, Canton Youngstown Rd. Co.
(1951), 155 Ohio St. 185, the Supreme Court of Ohio stated:
 "A person of ordinary mind cannot say that he was misled into signing a paper which was different from what he intended to sign when he could have known the truth by merely looking when he signed. * * * If a person can read and is not prevented from reading what he signs, he alone is responsible for his omission to read what he signs." Id.
at 191. See, also, ABM Farms, Inc. v. Woods (1998), 81 Ohio St.3d 498, 503.
Again, unfortunately for Safe Auto, this rule applies to people of ordinary mind who can read. Davis had an opportunity to read the document but testified she was unable to do so. She testified she cannot read, and has been driving around for fifteen years unable to read street signs. She testified that her husband did read it, but there was no testimony regarding what effect his reading of the application had on her understanding of the document. In any case, she testified that before signing the application she called Safe Auto for an explanation, and it was in the course of this phone call that Davis alleges Safe Auto made material misrepresentations regarding uninsured motorist coverage. Therefore, she arguably made a reasonable effort to learn the meaning and implication of the terms, and only signed due to an alleged misrepresentation, thus bringing the argument full circle.
Regarding the burden of proving whether a rejection of UM coverage was knowingly made, the Supreme Court of Ohio stated, "insurance companies bear `the burden of showing that any rejection was knowingly made by the customer.'" Gyori v. Johnston Coca-ColaBottling Group, Inc. (1996), 76 Ohio St.3d 565, 567, citing Ady v. W.Am. Ins. Co. (1982), 69 Ohio St.2d 593, 597. We hold that where an insurance company is able to produce an application for insurance which contains a separate and unambiguous rejection clause which has been signed by the insured, the insurance company has met its burden and presented a prima facie case that the rejection was expressly and knowingly made. At that point, therefore, the burden shifts, and the insured carries the burden of showing the rejection was not knowingly made. As a matter of law, this will require some evidence more substantial than simple testimony like "I just did not understand what I was doing" standing alone. In the present case, if Davis were literate, this Court would be inclined to impose the rule set forth in Dice, supra, as a matter of law. There is case law where non-English speaking individuals have been obliged to abide by the terms of written contracts which they did not have the ability to read, yet signed. Muskovitz v. Sun Underwriter's Agency (1913),3 Ohio App. 422. However, as it stands, as a result of her testimony alleging her inability to read, her efforts to clarify her understanding by calling, and the subsequent alleged misrepresentations, Davis met her burden of producing sufficient competent evidence to submit the case to the jury. It is the jury's province to determine its weight and the credibility of the witnesses, and they believed her. How an insurance company insures itself against claims of contractual ignorance is a question they themselves will have to resolve. Safe Auto's first assignment of error is without merit.
In Safe Auto's second assignment of error, it argues the trial court erred when the court declined to give the jury instructions it requested. A charge to the jury should be a plain, distinct and unambiguous statement of the law as applicable to the case made before the jury by the proof adduced. Marshallv. Gibson (1985), 19 Ohio St.3d 10, 12, citing Parmlee v. Adolph
(1875), 28 Ohio St. 10, paragraph two of syllabus. "A jury is entitled to receive from the court such instructions in the general charge as will fully place it in possession of the issuable facts in controversy as pointed out by the pleadings and the evidence." Simko v. Miller (1938), 133 Ohio St. 345, 358. An incomplete charge will constitute grounds for reversal of the judgment where the charge as given misleads the jury. Marshal,supra, at 12.
The standard of review for an appellate court is whether the trial court's refusal to give a requested instruction constitutes an abuse of discretion under the facts and circumstances of the case. Prejean v. Euclid Bd. of Educ. (1997), 119 Ohio App.3d 793,804-805, citing State v. Wolons (1989), 44 Ohio St.3d 64. The term abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151,157.
This case boiled down to one issue, "was uninsured motorist coverage expressly and knowingly rejected by Davis?" In relevant part, the court's instruction gave a plain and succinct statement of the issue, stating:
 "[t]he issue for you to decide is whether or not the plaintiff expressly and knowingly rejected uninsured motorist coverage.
 "If you find by the greater weight of the evidence that the plaintiff did not expressly and knowingly reject uninsured motorist coverage, then your verdict must be for the plaintiff.
 "If you find the plaintiff did expressly and knowingly reject uninsured motorist coverage or that she failed to prove by a greater weight of the evidence that she did not expressly and knowingly reject the uninsured motorist coverage, then your verdict must be for the defendant."
This instruction fully placed with the jury the issue in controversy. Arguably, it may have been better if the instruction included legal definitions of the terms "expressly" and "knowingly." Nevertheless, these terms are in the normal lexicon of lay people. They are not beyond their understanding, nor would the common understanding of the terms be substantially different from a legal definition. There was no question that Davis signed the policy application, thereby expressly rejecting the coverages. However, this case really turned on the issue of whether or not that was done knowingly. That it be done knowingly (as well as expressly) is a requirement imposed by the rulings of the Supreme Court of Ohio inAbate and Gyori, supra. The legal definition of "knowingly" supplied by Ohio Jury Instructions is as follows:
 "1. KNOWINGLY. A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result. A person has knowledge of circumstances when he is aware that such circumstances probably exist.
 2. ALTERNATE. Knowingly means that a person is aware of the existence of the facts and that his acts will probably cause a certain result." 4 Ohio Jury Instructions (1997), Section 409.11, at 61.
The simple question the jury had to resolve was whether Davis was aware that when she signed the rejection sections on the policy application the result would be she would not have uninsured motorist coverage. In terms of posing that question to the jury, there is nothing incomplete or misleading about the instruction as given, without a legal definition of "knowingly." Did she know what the result of signing would be? That was the question. The instructions as issued by the court accurately posed that question to the jury.
Safe Auto also proposed instructions related to her legal obligation to learn the contents of the policy, and the legal implications of her failure to learn its contents. Those instructions would have been superfluous. That line of reasoning inevitably leads back to the phone call she made before she signed, wherein the alleged misrepresentations were made by Safe Auto. Her testimony has her meeting her duty to learn the contents of the policy by making the phone call, and the case returns to the sole issue — was the rejection made knowingly?
We cannot say the court abused its discretion in declining to include Safe Auto's proposed instructions, or in the wording it chose to use. Safe Auto's second assignment of error is without merit.
The judgment of the trial court is affirmed.
 ________________________ JUDGE WILLIAM M. O'NEILL
FORD, P.J., concurs, CHRISTLEY, J., concurs in judgment only.