{¶ 64} In this appeal from a jury verdict, following trial before Visiting Judge Joseph Nahra, I concur in the majority's resolution of the first and second assignments of error, but I would sustain the third assignment of error and reverse the directed verdict on Sullins' claim that UH nurses were negligent in failing to note Mrs. Sullins' past exposure to tuberculosis and instituting the proper protocols to discover and treat a possible tuberculosis infection, which would make the fourth assignment of error moot. I, therefore, concur in part and dissent in part.
 {¶ 65} While Mrs. Sullins had never suffered from tuberculosis and was not exhibiting any signs of a currently active tuberculosis infection upon admission, the nurse's Patient History taken at each admission noted only a history of arthritis and stomach problems, (ulcers), and no history of seventeen other conditions/diseases including diabetes, tuberculosis and kidney problems when it is clear that Mrs. Sullins knew she had been exposed to tuberculosis during her work with the Salvation Army and would have so responded if asked.
 {¶ 66} On September 26th, Nurse Betsy Sykora (nka Betsy Kirschner), noted that the PPD tests previously ordered by Dr. Warren had not been performed and wrote on Mrs. Sullins' medical chart both that the tests had not been done and Mrs. Sullins' asserted reactor-status to PPD tests. She took no action required by the internal disease-control protocols that mandate advising the ID department when a potential tuberculosis-infected patient enters the hospital.
 {¶ 67} At trial, Sullins contended that, although symptoms of both tuberculosis and tuberculous meningitis[1] had intermittently appeared with increasing frequency, the nursing staff had failed to initiate internal UH protocols designed to screen for, or alert physicians to, the possibility of a tuberculosis-related illness, thereby inhibiting its discovery and diagnosis. He alleged that the combination of the faulty nursing care and Dr. Woolley's allegedly "worthless" consult delayed detection of and, therefore, the treatment for, tuberculosis until it was too late to be effective.
 {¶ 68} Directed verdicts are governed by Civ.R. 50. "In determining whether to direct a verdict, the judge does not engage in a weighing of the evidence, nor does he evaluate the credibility of witnesses.[2] Rather, he is confronted solely with a question of law: Was there sufficient material evidence presented at trial on this issue to create a factual question for the jury?[3] In construing the evidence most strongly in favor of the nonmoving party, the judge must give the nonmoving party the benefit of all reasonable inferences that may be drawn from the evidence.[4] When considering a motion for directed verdict, the judge must determine not whether one version of the facts presented is more persuasive than another.[5] Rather, he must determine whether the trier of fact could reach only one result under the theories of law presented in the complaint.[6] When the record contains substantial competent evidence favoring the nonmoving party so that reasonable minds might reach different conclusions, the judge must deny the motion.[7] Appellate review of the grant or denial of a motion for directed verdict is de novo.[8]
 {¶ 69} Darla Haviland, a nurse and hospital administrator, testified, as an expert in hospital procedures, that internal disease screening and control procedures and protocols were mandatory, and were not followed in this case. As such, Sullins established genuine issues of fact as to the standard of care to which nurses are to be held and the possibility of a breach of that standard. Indeed, the Ohio Supreme Court has held that:
 {¶ 70} "1. Though a nurse is prohibited from engaging in the practice of medicine, a nurse employed by a hospital to which a patient is admitted by an attending physician is under a duty to keep the attending physician informed of the patient's condition so as to permit the physician to make a proper diagnosis and devise a plan of treatment for the patient.
 {¶ 71} "2. In order to fulfill their duty to inform the attending physician, nurses must perform a competent nursing assessment of the patient to determine the signs and symptoms presented by the patient that are significant in relation to the attending physician's tasks of diagnosis and treatment.
 {¶ 72} "5. Though nurses are prohibited from practicing medicine, the fact that a particular act is within the duty of care owed to a patient by an attending physician does not necessarily exclude it from the duty of care owed to the patient by a nurse, and such act is not excluded from the nurse's duty if it is within the standard of conduct required to satisfy the nurse's separate duty of care.
 {¶ 73} "6. The intervening negligence of an attending physician does not absolve a hospital of its prior negligence if both co-operated in proximately causing an injury to the patient and no break occurred in the chain of causation between the hospital's negligence and the resulting injury. In order to break the chain, the intervening negligence of the physician must be disconnected from the negligence of the hospital and must be of itself an efficient, independent, and self producing cause of the patient's injury."[9]
 {¶ 74} The parties also did not dispute that, since Ms. Haviland was a nurse, and not a licensed physician, she was incompetent to offer an opinion as to the proximate cause of Mrs. Sullins' death.[10]
 {¶ 75} UH argued at trial that Sullins' physician-expert, Dr. Steven Hosea, admitted on cross-examination that the nursing care was not the proximate cause of Mrs. Sullins' death. On direct examination, however, Dr. Hosea testified that early detection of tuberculosis, in which the nurses were required to take part through their internal screening and disease-control procedures, would have resulted in earlier treatment and Mrs. Sullins' recovery. On re-direct, Dr. Hosea further stated that "the failure to document, diagnose" Mrs. Sullins' tuberculosis was the cause of her death, and that all medical personnel treating her at UH shared responsibility for her demise.
 {¶ 76} The majority ignores other testimony he offered which did assign fault to the nurses. One failed to note Mrs. Sullins' exposure to tuberculosis upon her intake interview, which information about her dormant tuberculosis was elicited by Nurse Sykora eight days later, or to Nurse Sykora who, learning of Mrs. Sullins' reactor-status to the PPD test, failed to advise the infectious disease department as mandated by the internal tuberculosis-control protocols.
 {¶ 77} Where a plaintiff's expert testimony on cross-examination negates his earlier opinion assigning blame to defendants, such testimony does not cancel out his earlier assessment; it merely calls his credibility into question for the jury's evaluation.[11] Reasonable minds might find the nurse(s) negligent based upon the undisputed failure of any nurse to properly document Mrs. Sullins' past tuberculosis exposure upon admission, or Nurse Sykora's failure to institute the appropriate protocol after learning that Mrs. Sullins was reactive to the PPD test. Dr. Hosea testified that if Mrs. Sullins had been properly diagnosed and had received appropriate medication as late as September 28th, she would have survived and fully recovered. Because Dr. Hosea provided the nexus between the nurses' omissions and the cause of death, I would sustain this assignment of error and remand for retrial of Sullins' nursing negligence claims.
[1] Some signs of a tuberculosis infection exhibited by Mrs. Sullins included loss of appetite, low-grade fever, and coughing. When tuberculosis infects the central nervous system, it can cause tuberculous meningitis, which results in symptoms including headache, decreased mentation and disorientation; pain in the back can be indicative of a central nervous system infection of some sort. As the majority notes, Mrs. Sullins did exhibit signs of possible tuberculin infection in her central nervous system, such as headache, disorientation and lower back pain at various times during the first few days of her hospitalization.
[2] Ruta v. Breckenridge-Remy Co. (1982), 69 Ohio St.2d 66, 67-68,430 N.E.2d 935, 937.
[3] Id., citing Malone v. Courtyard by Marriott L.P. (1996),74 Ohio St.3d 440, 445, 659 N.E.2d 1242, 1247.
[4] Broz v. Winland (1994), 68 Ohio St.3d 521, 526, 629 N.E.2d 395, 399; Blair v. Goff-Kirby Co. (1976), 49 Ohio St.2d 5, 10, 358 N.E.2d 634,637.
[5] Strother v. Hutchinson (1981), 67 Ohio St.2d 282, 284, 21 Ohio Op.3d 177, 423 N.E.2d 467, 469-470.
[6] Id.
[7] Ramage v. Cent. Ohio Emergency Serv., Inc. (1992), 64 Ohio St.3d 97,109, 592 N.E.2d 828, 837.
[8] Grau v. Kleinschmidt (1987), 31 Ohio St.3d 84, 90, 509 N.E.2d 399;Steppe v. K-mart Stores (1999), 136 Ohio App.3d 454, 737 N.E.2d 58.
[9] Berdyck v. Shinde (1993), 66 Ohio St.3d 573, 1993-Ohio-183,613 N.E.2d 1014, syllabus. Internal citation omitted.
[10] See Evid.R. 601(D).
[11] Nichols v. Hanzel (1996), 110 Ohio App.3d 591, 674 N.E.2d 1237.