[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION AND JUDGMENT ENTRY
This is an appeal from a Scioto County Common Pleas Court judgment granting a directed verdict in favor of Duane J. Marchyn, M.D., William L. Buente, M.D., and Southern Ohio Medical Center ("SOMC") defendants below and appellees herein.
Appellants raise the following assignments of error for review:
FIRST ASSIGNMENT OF ERROR:
 "THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFFS-APPELLANTS WHEN IT DISMISSED THE CAUSE, OF ACTION OF NEGLIGENT CREDENTIALING THROUGH THE APPLICATION OF THE PEER REVIEW STATUTES R.C. 2305.25 ET SEQ."
SECOND ASSIGNMENT OF ERROR:
 "THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFFS-APPELLANTS THROUGH ITS REFUSAL TO ALLOW A MEDICAL DOCTOR TO GIVE OPINIONS AS TO TREATMENT, PROXIMATE CAUSE AND DAMAGES IN DEFERENCE TO EVID.R. 601 (D)."
THIRD ASSIGNMENT OF ERROR:
 "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE PLAINTIFFS-APPELLANTS WHEN IT DIRECTED A VERDICT FOR THE DEFENDANTS-APPELLEES CONTRARY TO CIV.R. 50 (A) (4)."
On March 22, 1995, appellant[1] suffered injuries during the course of his employment. A steel I-beam hit appellant's thoracic and lumbar spine areas posteriorly and a concrete block fell across appellant's right lower leg. Appellant was transported to SOMC, where Drs. Marchyn and Buente assisted in appellant's treatment.
On September 26, 1996, appellants filed a medical malpractice complaint against Dr. Marchyn, Dr. Buente, and SOMC. All three appellees subsequently filed motions for summary judgment. Appellees argued that the applicable statute of limitations had expired. On December 19, 1996, the trial court granted summary judgment in favor of all three appellees. Appellants appealed and this court reversed. See Greene v. Marchyn (July 7, 1997), Scioto App. No. 97 CA 2484, unreported.
On November 20, 1997, appellants filed an amended complaint. Appellants asserted negligence on the part of all three defendants. Appellants alleged that the doctors were negligent in their failure to properly diagnose and treat appellant's spinal fractures. Appellants claimed that the hospital also was liable under the doctrine of respondeat superior. The complaint further contained a cause of action for negligent credentialing against SOMC, as well as a loss of consortium claim on behalf of Tina M. Greene.
On November 20, 1997, SOMC filed a motion for summary judgment on the negligent credentialing claim. SOMC asserted that appellants could not overcome the statutory presumption set forth in R.C. 2305.25 (B) (1) that a hospital is not negligent in the credentialing of a qualified person. To support its motion, SOMC attached evidence demonstrating that the Joint Commission on Accreditation of Health Care Organizations had accredited the hospital.
On March 4, 1999, the trial court granted SOMC summary judgment on the negligent credentialing claim. The trial court considered the credentialing information attached to appellants' memorandum in opposition and found that appellants had failed to rebut the 2305.25 (B) (1) presumption that a hospital is not negligent in the credentialing of a qualified person.
On July 12, 1999, and continuing through July 15, 1999, the trial court held a jury trial. The testimony and evidence adduced at trial reveal the following facts.
Dr. Marchyn, the orthopedic surgeon on-call in the emergency room, examined appellant's leg and back. Dr. Marchyn noted that appellant's leg had an obvious fracture — the bone had broken through the skin. Dr. Marchyn concluded that appellant had sustained "an open long oblique fracture of the junction of the mid and distal thirds of the right tibia and mid shaft fracture of right fibula."
Dr. Marchyn further noted that appellant complained of back pain. Dr. Marchyn found appellant to have diffuse tenderness over his thoracic and lumbar spine. Dr. Marchyn performed a neurovascular examination upon appellant, which was "intact."
To determine the extent of appellant's injuries, x-rays were taken of his leg and of his back. A bone scan also was performed. Dr. Buente, a diagnostic radiologist, interpreted the x-rays and the bone scan. Dr. Buente testified that he did not observe any obvious fractures in appellant's back. Dr. Buente concluded that the x-rays demonstrated that appellant had some wedging associated with the D7 and D11 vertebral bodies, but that the wedging had not resulted from the March 22, 1995 incident. Rather, Dr. Buente determined, by examining some x-rays taken of appellant's chest during 1992, that the wedging had existed prior to March 22, 1995.
Dr. Buente testified that his interpretation of the bone scan revealed increased uptake in the mid-dorsal spine. Dr. Buente testified that increased uptake may indicate some abnormality in the dorsal spine and that it may signal an active repair occurring within the skeletal system.
Dr. Buente testified that the cause of the apparent wedging and increased uptake could have been the March 22, 1995 trauma. Dr. Buente also stated, however, that the "exact same finding" could be made with respect to a person who had experienced a traumatic injury months or years ago and that increased uptake in the spine can be caused by other conditions, such as cancer, arthritis, or infection.
Dr. Marchyn testified that he also reviewed the x-rays of appellant's thoracic and cervical spine. Dr. Marchyn noted that the x-rays revealed that appellant had some anterior wedging of the T7, D11, and L1 vertebral bodies, but stated that he noticed "no significant, horribly displaced fractures that would require immediate attention." Thus, Dr. Marchyn concluded that the x-rays did not demonstrate "a significant acute problem that required immediate attention."
Dr. Marchyn reviewed the bone scan and noted that the bone scan did not show any increased uptake at L1. Dr. Marchyn observed that the bone scan revealed marginal increased thoracic uptake, but that appellant's previous chest x-ray from two and one-half years ago revealed wedging of the D7 and D11 vertebral bodies. Dr. Marchyn concluded that appellant had an "equivocal lower thoracic lateral compression fracture at the thoracic vertebrae of 11 and lumbar 1, less than 10 percent." Dr. Marchyn ultimately concluded that appellant probably had sustained a contusion to his back and a thoracolumbar strain.
Dr. Marchyn treated appellant's back by ordering a moist heat pad and by prescribing an anti-inflammatory pill. Dr. Marchyn noted that because of appellant's broken leg, appellant already was receiving intravenous narcotics, pain medication, and significant rest. Dr. Marchyn stated that he did not believe a back brace was necessary to treat appellant's back. Dr. Marchyn testified that he prescribes braces for patients who have significant compression fractures; Dr. Marchyn did not believe appellant had significant compression fractures.
Dr. Marchyn testified that on March 31, 1995, he saw appellant for a follow-up visit. Dr. Marchyn noted that appellant's neurovascular exam continued to be intact in his lower extremities and that his back remained diffusely tender. Dr. Marchyn stated that appellant informed him that appellant's brother-in-law, Dr. Thomas Nonnenmacher, is a chiropractor and would like to help treat appellant's back. Dr. Marchyn indicated that he believed chiropractic treatment would be "reasonable" and saw "no reason why manipulation is contra-indicated." Dr. Marchyn again noted that appellant did not have any obvious fractures.
Dr. Nonnenmacher testified that on April 25, 1995, appellant visited him for treatment. Upon examining appellant, Dr. Nonnenmacher noticed that appellant was tender in the middle of his back. Dr. Nonnenmacher sent appellant to the Paragon Diagnostic Center for some tests, including an MRI of the thoracic spine and an MRI of the lumbar spine. The MRIs revealed that appellant had sustained: (1) a moderate subacute compression fracture of T7; (2) an old moderate compression fracture of T8; (3) a mild subacute compression fracture of L1; and (4) a disc herniation at L5. An ultrasound spine scan revealed a moderate increase of superficial fibroadipose tissue throughout appellant's thoracic spine and was considered "clinically significant."
Dr. Nonnenmacher reviewed appellant's x-rays and determined that appellant suffers from kyphosis (a rounded back) and scoliosis. Dr. Nonnenmacher stated that a spinal fracture is one cause of kyphosis. Dr. Nonnenmacher opined that appellant's fractures in the thoracic spine contributed to the kyphosis and the scoliosis.
Dr. Nonnenmacher prescribed a back brace for appellant to help ease the pressure on his lower back. Dr. Nonnenmacher informed appellant that as a chiropractor, he could not treat fractures and he referred appellant to Dr. Thomas Goodall, a neurological surgeon. Dr. Nonnenmacher continued to monitor the progress of appellant's fractures by ordering multiple MRIs throughout the course of treatment.
On May 30, 1995, appellant visited Dr. Goodall. Dr. Goodall noted that his examination of appellant revealed the following:
 "On examination, there may be a mild decreased knee jerk on the left. Muscle strength testing is good. Sensory shows diffuse decreased perception of pinprick throughout the left lower extremity, nondermatomal in nature. He straight leg raises to 60 degrees and complains of back pain. This is bilateral. He forward bends to 60 degrees and extends to 10 degrees. He laterally flexes right 20 degrees and left 30 degrees. There are incisions in the right lower extremity consistent with his prior surgery. There is moderate tenderness in the mid thoracic region and mild tenderness in the lumbar region."
Dr. Goodall concluded that appellant was suffering from lumbodorsal strain and thoracic and lumbar compression fractures.
Dr. Goodall testified that when he first saw appellant, appellant had yet to receive any actual treatment for the fractures. Dr. Goodall stated that "routinely, the treatment for the fracture would be bracing, limitation of activity." Dr. Goodall noted that bracing stabilizes the bones. Dr. Goodall testified that he had not prescribed a brace for appellant because "if you're going to brace somebody, you would brace them early on, as opposed to [two months post injury]."
Subsequent MRIs performed upon appellant revealed "no frank worsening of the degree of compression involving the vertebral bodies of T7, T8, and L1 since [the date of the first MRI]." The MRIs showed evidence of healing. The lumbar MRI revealed disc degeneration in the lower lumbar spine and a small left central disc herniation at the lumbosacral level. An October 3, 1995 MRI study of the thoracic and lumbar spine revealed that the disc hernia was of a "rather broad based and sizeable defect" and that it may have increased in size.
On March 18, 1996, Dr. Goodall reviewed the MRIs performed from June 27, 1995 to January 30, 1996 and noted that the reports revealed a herniated lumbar disc and healed compression fractures. Dr. Goodall noted that appellant continued to complain, inter alia, of thoracic spine pain, chest wall pain, sternal pain, cervical spine pain, and lumbar spine pain. Dr. Goodall testified that he concluded that appellant was suffering from "lumbar fracture, thoracic fracture, herniated lumbar disc, cervical strain, multiple cervical disc bulges, and post-traumatic occipital neuralgia."
A July 15, 1996 MRI study concluded that appellant was suffering "disc bulging primarily, C5-6 and C6-7."
On August 26, 1996, a full column myleogram was performed upon appellant. The test revealed multiple disc herniation in the lower thoracic regions. The report concluded: "Fracture deformities of the T7 and T8 vertebral bodies with minimal kyphotic angulation of the thoracic spine at these levels. No significant spinal canal narrowing identified at this level. Minimal disc bulges at the T7-8, T8-9, T10-11, T11-12 and T12-L1 levels."
A February 1997 MRI study revealed that appellant's fractures remained unchanged in size and shape. The report indicated that the dorsal MRI did not appear significantly changed from the original April 1995 study.
Dr. Walter H. Hauser, an orthopedic surgeon, testified that on January 28, 1998, he performed an independent medical examination upon appellant. Dr. Hauser noted that appellant had a mildly increased dorsal kyphosis and that appellant was tender in the mid-thoracic area.
Dr. Hauser stated that his review of the x-rays, bone scan, and other tests performed upon appellant revealed that appellant had suffered compression fractures of the seventh and eighth thoracic vertebrae. Dr. Hauser testified that if Dr. Marchyn had identified the fractures, he could have cautioned appellant. Dr. Hauser further stated that if he had been aware of the fractures, he would have used a brace.
Dr. Hauser additionally asserted, however, that assuming Dr. Marchyn failed to properly treat appellant for the thoracic fractures, the outcome would have been the same. Dr. Hauser explained: "But the bottom line was that [appellant] had a fractured leg and it kept him from returning to any kind of activity that would have involved bending, lifting or twisting." Dr. Hauser continued: "[T]he failure to make the additional diagnosis — or the initial diagnosis on these fractures in my opinion didn't significantly alter his outcome. * * * He had the lack of knowledge of his fracture and he probably had more discomfort than if he would have been aware of it."
While Dr. Hauser stated that the failure to prescribe a back brace did not affect appellant's ultimate outcome, Dr. Hauser recognized that appellant "would have been more comfortable in a brace." Dr. Hauser further stated that "[t]he brace would probably have provided some comfort to him and reduced his pain level."
Dr. Hauser further explained that the back brace is not necessarily helpful with respect to the healing process. Rather, Dr. Hauser explained, the back brace is used to prevent the patient from aggravating the fracture and to alleviate the stress on the muscles.
Appellants attempted to qualify Dr. William Maxfield, who is board certified in radiology and nuclear medicine, as a medical expert. Dr. Maxfield's testimony pertaining to his qualifications to testify as a medical expert in a medical malpractice case against an orthopedic surgeon and a radiologist follows.
Dr. Maxfield stated that after he finished medical school in 1954, he performed a general rotating internship which encompassed rotation through all of the major medical specialties, including orthopedics. Dr. Maxfield testified that after he fulfilled his internship and residency requirement, he returned to his hometown and worked for approximately one year at his family's clinic hospital performing diagnostic radiology, nuclear medicine, and radiation therapy.
Dr. Maxfield stated that in August of 1956, he went on active duty with the U.S. Navy and was assigned to the Chelsea Navy Hospital to establish a nuclear medicine program. In March of 1957, Dr. Maxfield transferred to Bethesda Naval Hospital, where, initially, he was the assistant chief of nuclear medicine and then became the chief of nuclear medicine. Dr. Maxfield stated that during his time in the U.S. Navy he had treated patients who had trauma injuries to spine.
Dr. Maxfield further stated that in 1972, he opened a private practice in the Tampa Bay area and has essentially practiced radiology, radiation therapy, nuclear medicine, and hyperbaric medicine[2] since 1972.
The following colloquy occurred concerning Dr. Maxfield's competence to testify as to the standard of care required of orthopedic surgeons and of radiologists:
 "Q: Dr. Maxfield, are you familiar with the standard of care of an orthopedic surgeons interpretations [sic] of x-rays?
A: Yes, I am.
 Q: Are you familiar with the standard of care for orthopedic surgeons in the interpretation of bone scans?
 A: Most orthopedic surgeons do not directly interpret bone scans. The radiologist is the one that actually does the interpretation. Many of the orthopedic surgeons, particularly in our area, do review the bone scans and if they don't like what they see they'll come back and ask us to defend what we've said.
 Q: Are you familiar with the standard of care an orthopedic surgeon would need to make for interpretation of x-rays for treatment?
A: Yes, I am.
 Q: Have you participated in the treatment of patients with orthopedic problems?
A: Yes, I have.
 Q: Can you describe the types of problems these patients might have?
 A: As I mentioned earlier, in the practice of radiation therapy when you have someone that has involvement of the spinal column that you frequently put them in braces and things until you get the bones to heal from the radiation therapy that you're giving to them, so you get the bones [sic] stability reestablished based on what you see on your x-rays and based on what you see on your bone scans and knowing the history of the patient, so from that standpoint I have ordered braces for patients that were directly under my care.
 I am also familiar with the imaging procedures that are needed to establish an accurate diagnosis prior to outlining a plan of treatment for orthopedic patients.
 Q: Have you worked with orthopedic surgeons in treatment plans?
A: Yes, I would say that I have.
Q: How many times have you done that?
 A: It's sort of part of our routine, on-going practice because we make recommendations for other imaging procedures that we would feel would enhance the ability to make a correct diagnosis on the patient. For instance, when we see x-rays of a knee that has had a significant injury and we don't see anything on the routine x-rays of the knee, then we will suggest getting an MRI or getting a[n] arthrogram or other procedures that are done to give a more specific diagnosis.
 Q: Do you have an opinion as to whether Dr. Marchyn['s] original interpretation or viewing of the x-rays of March 22, 1995 fell below the standard of care toward [appellant]?
[Objection overruled].
 A: My opinion is based on the findings that are on the plain x-rays that we looked at that showed that there was an acute wedging of the seventh dorsal vertebra and also the eighth dorsal vertebra and that the bone scan showed a positive localization in the —
* * *
 Q: Doctor, are you familiar with the standard of care owed to patients of orthopedic surgeons in interpretation of x-rays?
 A: I am from the standpoint of the importance of the imaging procedures that are necessary to establish an
accurate diagnostic bases or diagnosis for orthopedic problems, yes.
* * *
 Q: * * * Do you have an opinion to a reasonable degree of medical certainty as to [whether] Dr. Marchyn's interpretation of the bone scan on approximately March 22, 1995 fell below the standard of care owed to [appellant]?
[Objection overruled]
A: Yes, I have an opinion.
Q: Would you state that opinion?
 A: My opinion is that the bone scan was positive and the request at the top of the report of the bone scan was rule out thoracic fracture and in my opinion the bone scan ruled in thoracic fracture.
* * * *
 A: * * * [A]re you familiar with the standard of care owed by radiologists, diagnostic radiologists in the interpretation of x-rays and bone scans?
A: Yes, I am.
Q: And what is that standard of care?
 A: The radiologist has a duty to the patient to accurately describe the findings on the imaging and procedures, be it x-ray or bone scan, and to correlate the findings on the different imaging procedures to give the most accurate diagnosis that is possible from the imaging procedures.
 Q: Do you have an opinion, based upon a reasonable medical certainty, that the standard of care provided by Dr. Buente fell below the standard of care expected in performance of his duties toward [appellant]?
A: Yes, I do.
Q: What do you base that opinion on?
 A: I base that opinion on the fact that the acute fracture of the seventh thoracic vertebrae was not reported on the standard x-ray films of 3/22/95 and, in fact, it was described as an anterior wedging of the seventh thoracic vertebrae was, in the interpretation, attributed to an old injury. On the bone scan the question was to rule out thoracic spine fracture and there is increased localization which is synonymous with acute fracture.
 Q: Do you, doctor, have an opinion, based on a reasonable medical certainty, as to Dr. Marchyn['s] failure to provide additional interpretive testing for [appellant]?
MR. RUGGERIO: Objection.
THE COURT: Sustained.
* * *
 Q: Doctor, you observed from the records that there was no further testing ordered by Dr. Marchyn, is that correct?
A: That is correct, yes.
 Q: And you observed from the records that there was no further testing requested by Dr. Buente?
 A: That is correct. I should say not requested, but suggested because most of the time the radiologist does not actually order the procedure. He makes the recommendation to the referring physician who then orders the procedure.
* * * *
 Q: Dr. Maxfield, have you participated with orthopedic surgeons in treatment decisions?
 A: Yes, I have, as I have already testified, I believe.
 Q: I thought you did also. Can you again, for the Court, can you tell us what types of treatment decisions you've assisted in, participated in with orthopedic surgeons?
 A: Yes, I can. To make a decision as to treatment you have to first establish an accurate diagnosis and this is where the radiologist plays a very important role because you can suggest additional imaging procedures to further delineate the true diagnosis and until you can establish a true diagnosis, you cannot formulate a treatment plan that would meet this standard of care, so the radiologist has a very important role in this and part of this is basing our knowledge on the procedures that have already been done to recommend additional studies that would either confirm or deny a given diagnosis.
 Q: Once that diagnosis has been confirmed by you and the orthopedic surgeon, have you participated further in any treatment decisions of patients?
 A: Yes, as I indicated, in the past when I have had patients that needed bracing, I have ordered the braces, both with the concurrence and without the concurrence of the orthopedic surgeon, because, in my opinion, the bracing was needed to prevent collapse of the vertebral bodies until we could get them restrengthened when treating patients with involvement of a cancer in the bones and also I have requested braces for patients that have had traumatic injuries to the spinal column.
During the course of Dr. Maxfield's testimony, appellees objected to Dr. Maxfield testifying as to whether Dr. Marchyn's failed to properly treat appellant's spinal fractures. The court discussed the issue as follows:
 "THE COURT: I think where we are * * * that if [the] parties can show that the fields overlap and there is some familiarity with one field with another, that they would be allowed to testify, which I think is consistent with what I said yesterday in the courtroom. We have the testimony of a radiologist to testify about the standard of care against an orthopedic surgeon. In that particular, yesterday, from what I can remember, the testimony was such that I allowed the radiologist to give testimony regarding the breach of standard of care when it came to interpreting x-ray films.
 The Defendants may have felt that was a stretch, but I based that on the fact that Dr. Marchyn testified that within his field he reads a lot of x-rays as part of his job, and at one point Dr. Marchyn testified that he feels he can read x-rays as well as Dr. Buente, so I allowed that. But yesterday, at no time, in my opinion, was there sufficient testimony that showed that the radiologist expertise or field overlapped with that of the orthopedic surgeon except when it came to radiation therapy, and in radiation therapy he testified that he prescribes and uses back braces, with or without consent or approval of the orthopedic surgeons.
 That to me is about as close as we got in the overlapping aspect of it, and the problem I have with that was in the radiation therapy situation, it would be my understanding from his testimony, that the radiologist would be the boss, in the treating of cancer and in the giving of this radiation therapy. He then becomes the primary caregiver in that situation and orders that in his way of specialty because of the degeneration from cancer of the spine and the vertebrae."
Thus, the trial court concluded that Dr. Maxfield could not testify as to whether Dr. Marchyn's failure to prescribe a back brace fell below standard of care. The court did permit Dr. Maxfield to testify that both doctors failed to adhere to the standard of care in interpreting the x-rays and the bone scan.
The trial court then afforded appellants an additional opportunity to attempt to qualify Dr. Maxfield as a medical expert with respect to whether Dr. Marchyn failed to properly treat appellant. The dialogue continued as follows:
 "Q: Dr. Maxfield, I want to review a couple of areas with you regarding one of your educational areas and that would be during medical school. Did you take any courses that's related to orthopedics?
 A: Yes, orthopedics was one of the areas of rotation in medical school.
 Q: And did you learn, what did you learn in those courses? Can you give us a description of what they were about?
 A: The course was about the different areas of orthopedics that was practiced at that time and that was about fractures and making a diagnosis of fractures, making the diagnosis of arthritic conditions in the bones and the methods of treatment of bone fracture and the orthopedic surgical procedures being done at that time.
 Q: Did any of that education relate to fractures in the vertebrae?
 A. Yes, we saw patients that had vertebral fractures and that was part of the experience that I had.
 Q. Now you said experience, you had experience other than your educational classes?
 A. In the medical school that I went to, the last two years were actually more clinical than in many medical schools and so we rotated on to the service of the different services and actually worked in the emergency rooms so that we saw patients who came in with acute problems and also saw the surgical side of things, that's why when I went into my internship I was one of the ones that was put on the active surgical type programs because in medical school I had more experience than a lot of the other interns that were coming in that had been in schools that were more academic in all four of their years.
 Q. During your internship were you involved with orthopedic surgeons?
 A. Yes, I was, that was one of the services that we performed and, as I said, my internship was in Southern Pacific General Hospital which was the industrial hospital for the railroads and we therefore saw fractures of every bone in the body and during two months of my internship I was rotated to one of the affiliate hospitals in Tucson, Arizona where there were two interns that essentially ran the hospital. We had a one hundred bed hospital we were responsible for and when we had a problem we had the consulting staff that would come in and work with us so that my internship was at the level really of what many physicians got in a residency program.
 Q. I would assume, correct me if I'm wrong, during your internship you worked with orthopedic surgeons too?
 A. Yes, because, as I said, a high percentage of our patients that we dealt with were fractures of different areas.
 Q. Did you yourself participate in the treatment of those fractures?
 A. Yes, because particularly the two months in Tucson, Arizona the intern was the surgical assistant to whatever surgical procedures were being done and that was general surgery and orthopedics predominantly in that hospital.
Q. Did you yourself participate in that program?
A. Yes, I was the first assistant.
 Q. Did you participate in any subsequent programs while you were in the Navy?
 A. Only in the diagnosis of problems because in the Navy at Chelsea Naval Hospital and also at the Bethesda Naval Hospital my experience was in the emergency room where as the emergency room physician you took care of whatever came in the emergency room and made the diagnosis and then I referred it to whatever specialist that needed to be done so that my Navy experience was not directly in the operating room with the orthopedic surgeons, but we were doing x-rays and other procedures relative to them.
 Q. During the course of your practice have you worked with orthopedic surgeons?
A. Yes, very extensively.
 Q. And in what capacity have you worked with orthopedic surgeons?
 A. By doing the imaging procedures for the orthopedics surgeons, making recommendations as to other studies that could be done that might give more information and might provide an exact diagnosis as to the problems that the individual has, and then in the field of hyperbaric oxygen we deal with a lot of wound healing and bone healing problems from the orthopedic surgeons and I have acted as a consultant also for patients that have come to me with questions as to whether to proceed with an operative procedure that's been recommended. For instance, taking a foot off or taking a leg off and to see if there is an alternative ways of treating these people and keeping that extremity functioning.
 Q. During the course of your practice have you been involved in the treatment of orthopedic problems?
 A. Yes, that's what I just indicated that I have treated the non-healing fractures, treated the infected bones, I've treated infected joint prosthesis, I've treated non-healing surgical incisions for the orthopedics surgeon and we've treated patients that we've been able to keep the limb on rather than having it be removed."
Dr. Maxfield further testified that he learned about prescribing back braces through his years of experience working in a broad range of medicine and by knowing the principles of bone healing and the principles of what is necessary to maintain the continuity of the spinal column. He further testified that he has worked with orthopedic surgeons in prescribing braces and that he also has prescribed back braces without the assistance of an orthopedic surgeon.
Dr. Maxfield stated that he does not, however, on a regular basis, place casts on people with broken bones, but that during his early medical years, he had placed casts on broken bones. Dr. Maxfield noted that while he does not perform orthopedic procedures, he has placed braces on simple fractures and he is familiar with general therapeutic procedures for treatment of the spine: bracing; putting in heritin rods; and operative procedures.
Dr. Maxfield also testified that throughout his career he has applied, with the assistance of an orthopedic surgeon, approximately fifteen to twenty back braces to patients with traumatic fractures and that he has asked orthopedic surgeons to prescribe braces for him. Dr. Maxfield explained that the purpose of a brace is to immobilize and protect the integrity of the bony structure.
Dr. Maxfield further explained that he primarily prescribes braces for his radiation therapy patients. In recent years, however, he has not prescribed braces for patients who have suffered a traumatic injury. Dr. Maxfield attempted to assert that the underlying process is the same. He stated that he had ordered braces for traumatic injuries to the back during his internship and during his time in the U.S. Navy. He further explained that he has prescribed back braces for his radiation therapy patients. Dr. Maxfield stated:
 "When you're talking about for the radiation therapy patient that has a cancer that has spread to the vertebral column, the thoracic vertebral column, you know that that is there and they get their wedging fracture and their compression fracture by the trauma that just normal activities put on the spinal cord so what I'm doing when I order the brace for a cancer patient is trying to prevent a compression fracture of the vertebrae, so it's preventive medicine in that circumstance.
 I've also ordered it for ones that have had wedging compression fracture of the vertebrae to keep it from compressing during the time that we were giving the radiation therapy to try to strengthen and regain the integrity of the bony structure."
The trial court questioned Dr. Maxfield as to his competence to testify with respect to an orthopedic surgeons' failure to treat a patient with compression fractures:
 "THE COURT: From the orthopedic surgeon['s] stand point, the standard of care, do you know what factors become relevant in the treatment of this condition as to whether a brace is put on or a brace is not used?
A: In my opinion, yes, I do.
THE COURT: And where do you gain that experience?
 A: My years of experience seeing the before and after results of orthopedic surgical procedures and knowing that the standard of orthopedics is to immobilize a fracture, but if you don't diagnose the fracture in the first place then you don't treat in properly.
 THE COURT: Are you saying that a brace, that the placement of a brace on an individual's back is the only correct treatment that should be given in this circumstance?
 A: No sir, I'm saying that it's the most conservative method of treatment, particularly for a thoracic spine injury. If the fracture impinges upon the spinal cord then you need an operative procedure to remove the pressure on the spinal cord, but that again is determined by a combination of the imaging procedures and the clinical evaluation of the patient."
The trial court finally concluded that Dr. Maxfield was competent to give expert opinion as to whether Drs. Marchyn and Buente: (1) breached the standard of care with respect to interpreting the x-rays and the bone scan; (2) should have ordered additional imaging procedures; and (3) properly diagnosed appellant's injuries. The trial court would not permit Dr. Maxfield to offer his opinion, however, as to whether Dr. Marchyn, an orthopedic surgeon, should have prescribed a brace.
Having clarified the issues about which Dr. Maxfield was competent to testify, the trial court permitted appellants to continue questioning Dr. Maxfield. Dr. Maxfield again opined that Drs. Marchyn's and Buente's diagnoses of appellant's injuries fell below the standard of care required of a radiologist. Dr. Maxfield explained that the x-rays demonstrated that appellant had an acute fracture of the seventh and eighth thoracic vertebrae and that the bone scan confirmed the fractures.
Dr. Maxfield also stated his opinion regarding the MRIs that were performed subsequent to appellant's discharge from the hospital. Dr. Maxfield stated that in his opinion, the September 10, 1997 MRI image showed that there was a burst type fracture of the seventh and eighth thoracic vertebrae. Dr. Maxfield testified that the September 10, 1997 MRI showed that there was a more severe wedging than what was present on the March 1995 films.
Dr. Maxfield also opined that the September 10, 1997 MRI demonstrated an increase in kyphosis and scoliosis compared to the x-rays taken on March 22, 1995. Dr. Maxfield explained the conditions kyphosis and scoliosis typically manifest:
 "Kyphosis is a term that we use when there is an anterior bending of the spinal cord or spinal area, the spinal column that on the x-rays that you looked at previously the spinal column in the thoracic area was fairly straight with just a little bit of bending, but when you develop kyphosis, when you have anterior wedging of several of the thoracic vertebrae then the column tends to collapse and become more curved and this is what we call kyphosis.
 On the other hand, when we look at the spinal column from the front and the back it is fairly straight up and down, but when it develops scoliosis then it develops sort of an "S" curve and the anterior to posterior pattern and we see both of those on the MRI study."
Appellants attempted to question Dr. Maxfield as to whether the doctors failure to properly diagnose appellant's fractures exacerbated appellant's spinal injuries and contributed to appellant's kyphosis and scoliosis. The trial court did not, however, find Dr. Maxfield competent to testify as to the proximate cause of appellant's injuries and, thus, prohibited Dr. Maxfield's opinion as to proximate cause.
At the close of appellants' case, appellees moved for a directed verdict. Appellees argued that appellants had failed to present any evidence as to proximate cause. The trial court agreed with appellees, and on August 6, 1999, the trial court granted a directed verdict in favor of Dr. Marchyn, Dr. Buente, and SOMC. Appellants filed a timely notice of appeal.[3]
 I
In their first assignment of error, appellants argue that the trial court erred by granting summary judgment in favor of SOMC on the negligent credentialing claim. Appellants contend that the trial court failed to consider material attached to their memorandum in opposition.[4] Appellants further assert that the trial court incorrectly determined that no discovery could be had of any information by any peer review committee.
SOMC argues that the trial court appropriately entered summary judgment in its favor with respect to appellants' negligent credentialing claim. SOMC asserts that appellants failed to overcome the R.C. 2305.25 presumption that a hospital is not negligent in credentialing. SOMC further argues that R.C.2305.251 protects peer review materials from random inspection and notes that the trial court had before it the doctors' complete credentialing records.
Initially, we note that when reviewing a trial court's decision regarding a motion for summary judgment, an appellate court conducts a de novo review. See, e.g., Grafton v. Ohio Edison Co.
(1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241, 245. Accordingly, an appellate court must independently review the record to determine if summary judgment was appropriate and need not defer to the trial court's decision. See Brown v. Scioto Bd. of Commrs.
(1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153, 1157; Moreheadv. Conley (1991), 75 Ohio App.3d 409, 411-12, 599 N.E.2d 786,788. In determining whether a trial court properly granted a motion for summary judgment, an appellate court must review the standard for granting a motion for summary judgment as set forth in Civ.R. 56, as well as the applicable law.
Civ.R. 56 (C) provides, in relevant part, as follows:
 * * * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.
Thus, a trial court may not grant a motion for summary judgment unless the evidence before the court demonstrates that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made. See, e.g., Vahila v. Hall (1997), 77 Ohio St.3d 421,429-30, 674 N.E.2d 1164, 1171.
In responding to a motion for summary judgment, the nonmoving party may not rest on "unsupported allegations in the pleadings."Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64,66, 375 N.E.2d 46, 47. Rather, Civ.R. 56 requires the nonmoving party to respond with competent evidence that demonstrates the existence of a genuine issue of material fact. Specifically, Civ.R. 56 (E) provides:
 * * * * When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the party does not so respond, summary judgment, if appropriate, shall be entered against the party.
Consequently, once the moving party satisfies its Civ.R. 56 burden, the nonmoving party must demonstrate, by affidavit or by producing evidence of the type listed in Civ.R. 56 (C), that a genuine issue of material fact remains for trial. A trial court may grant a properly supported motion for summary judgment if the nonmoving party does not respond, by affidavit or as otherwise provided in Civ.R. 56, with specific facts showing that there is a genuine issue for trial. Dresher, supra; Jackson v. Alert Fire Safety Equip., Inc. (1991), 58 Ohio St.3d 48, 52,567 N.E.2d 1027, 1031.
In Albian v. Flower Hospital (1990), 50 Ohio St.3d 251,553 N.E.2d 1038, paragraph two of the syllabus, the court discussed the claim of negligent credentialing as follows:
 "[A] hospital has a direct duty to grant and to continue such privileges only to competent physicians. A hospital is not an insurer of the skills of private physicians to whom staff privileges have been granted. In order to recover for a breach of this duty, a plaintiff injured by the negligence of a staff physician must demonstrate that but for the lack of care in the selection or retention of the physician, the physician would not have been granted staff privileges, and the plaintiff would not have been injured."
Moreover, in order to prove negligent credentialing, the plaintiff must prove the underlying medical malpractice claim against the doctor. Ratliff, supra; Dicks v. U.S. Health Corp. ofSouthern Ohio (May 10, 1996), Scioto App. No. 95 CA 2350, unreported.
R.C. 2305.25 (B),[5] enacted as part of House Bill 350, includes a presumption that a hospital is not negligent in the credentialing of a qualified person. R.C. 2305.25 (B) (3) further provides that "[i]f the plaintiff fails to rebut the presumption provided in division (B) (1) of this section, upon the motion of the hospital, the court shall enter judgment in favor of the hospital on the claim of negligent credentialing."
In State ex rel. Ohio Academy of Trial Lawyers v. Sheward
(1999), 86 Ohio St.3d 451, 715 N.E.2d 1062, the Ohio Supreme Court declared House Bill 350 unconstitutional.[6] Thus, because the trial court, in granting SOMC summary judgment, employed a statute that has subsequently been declared unconstitutional, we sustain appellant's first assignment of error. On remand, the trial court shall consider the effect that the Sheward case has upon the claim of negligent credentialing.[7]
Moreover, with respect to appellants' argument that the trial court incorrectly determined that no discovery could be had of any peer review material, we note that our decision in Kalb v.Morehead (May 19, 1998), Scioto App. No. 97 CA 2499, unreported speaks to this issue. In Kalb, we determined that a trial court possesses a duty to conduct an in camera inspection of material claimed to be protected pursuant to R.C. 2305.251. We stated as follows:
 "`When a trial court is presented with a situation in which an individual attempts to avoid testimony or a party attempts to prevent the introduction of certain evidence by asserting the privilege defined in R.C. 2305.251, it is incumbent upon the trial court to hold an in camera inspection of the information, documents or records in question and to question the witness as to the nature of his testimony.'"
Id. (quoting Gates v. Brewer (1981), 2 Ohio App.3d 347, 351,442 N.E.2d 72, 77).
Accordingly, based upon the foregoing reasons, we sustain appellant's first assignment of error and remand to the trial court for further proceedings.
 II
In their second assignment of error, appellants assert that the trial court erred by prohibiting appellants' medical expert, Dr. Maxfield, from giving expert opinion testimony as to Dr. Marchyn's failure to treat appellant's back and as to the proximate cause of the injury to appellant's back. Appellants assert that Dr. Maxfield, who practices in radiology, nuclear medicine, and hyperbaric medicine, testified that he received training in orthopedics and in surgery and that he had experience as a physician in diagnosing and treating back injuries. Appellants also assert that Dr. Maxfield testified that he specialized in radiology with training and experience in surgery and that he worked with orthopedic surgeons in the diagnosis and treatment of patients.
Appellees initially contend that appellants waived any error associated with the trial court's decision to exclude Dr. Maxfield's testimony. Appellees point out that appellants did not proffer Dr. Maxfield's testimony. Assuming appellants did not waive the issue, appellees argue, the trial court did not abuse its discretion by forbidding Dr. Maxfield from testifying as to Dr. Marchyn's failure to treat and as to the proximate cause of appellant's injuries. Appellees assert that the voir dire of Dr. Maxfield reveals that Dr. Maxfield had little experience as to whether appellant's compression fractures required a brace.
We disagree with appellees that appellants' failure to proffer Dr. Maxfield's testimony waived any error associated with the trial court's decision to prohibit Dr. Maxfield from testifying as to the two issues stated above. Generally, a party may not predicate error upon a ruling excluding evidence unless the party proffers the evidence. See Evid.R. 103;[8] State v. Gilmore
(1986), 28 Ohio St.3d 190, 503 N.E.2d 147. Evid.R. 103 does not require a proffer, however, when the substance of the evidence "was apparent from the context within which questions were asked." See, also, Gilmore, 28 Ohio St.3d at 192,503 N.E.2d at 149. In Gilmore, the court summarized the requirements for predicating error on the exclusion of evidence as follows:
 "[A] party may not predicate error on the exclusion of evidence during the examination in chief unless two conditions are met: (1) the exclusion of such evidence must affect a substantial right of the party and (2) the substance of the excluded evidence was made known to the court by proffer or was apparent from the context within which questions were asked."
Id.; see, also, State v. Davie (1997), 80 Ohio St.3d 311, 327,686 N.E.2d 245, 261.
In Gilmore, the court recognized that "the better practice * * * may be to proffer excluded evidence." Id.,28 Ohio St.3d at 192, 503 N.E.2d at 149. The court stated, however, that "under Evid.R. 103 a party is not required to proffer excluded evidence in order to preserve any alleged error for review if the substance of the excluded evidence is apparent to the court from the context within which questions were asked." Id.
In the case at bar, we believe that the substance of the excluded evidence is apparent from the context within which the questions were asked. The record reveals that all parties and the court recognized that appellant was attempting to qualify Dr. Maxfield as an expert to testify as to Dr. Marchyn's failure to treat appellant's back and as to proximate cause. Obviously, had the trial court permitted Dr. Maxfield to testify, Dr. Maxfield would have stated that: (1) Dr. Marchyn's failure to treat appellant's back fell below the standard of care; and (2) Dr. Marchyn's failure to treat, and Dr. Buente's failure to properly diagnose, appellant's back problem was a proximate cause of appellant's injuries.[9] Thus, we disagree with appellees that appellants have waived the issue concerning the trial court's decision to prohibit Dr. Maxfield from testifying with respect to Dr. Marchyn's failure to treat and with respect to proximate cause.
We now consider whether the trial court's decision prohibiting Dr. Maxfield from testifying as a medical expert with respect to Dr. Marchyn's failure to treat appellant's back and with respect to proximate cause affected appellants' substantial rights. A successful medical malpractice action requires the plaintiff to demonstrate that the defendant-physician failed to use that degree of skill, care and diligence that a physician or surgeon of the same medical specialty would employ in similar circumstances. See Berdyck v. Shinde (1993), 66 Ohio St.3d 573,579, 613 N.E.2d 1014, 1021; Bruni v. Tatsumi (1976), 46 Ohio St.2d 127,346 N.E.2d 673, paragraph one of the syllabus. As the court held in Bruni:
 "In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things."
Id. at paragraph one of the syllabus; see, also, Ramage v.Central Ohio Emergency Serv. Inc. (1992), 64 Ohio St.3d 97, 102,592 N.E.2d 828, 833; Littleton v. Good Samaritan Hosp. HealthCtr. (1988), 39 Ohio St.3d 86, 93, 529 N.E.2d 449, 455.
Proof of the recognized standards of care must be provided through expert testimony. Bruni, 46 Ohio St.2d at 131-32,346 N.E.2d at 677-78. "[The] expert must be qualified to express an opinion concerning the specific standard of care that prevails in the medical community in which the alleged malpractice took place, according to the body of law that has developed in this area of evidence." Bruni, 46 Ohio St.2d at 131-32,346 N.E.2d at 677-78; see, also, Ramage, 64 Ohio St.3d at 102, 592 N.E.2d at 833.
In Crosswhite v. Desai (1989), 64 Ohio App.3d 170,580 N.E.2d 1119, the court explained the underlying principle for requiring expert testimony in a medical malpractice case:
 "It has long been the rule in most jurisdictions that in cases of medical malpractice, expert testimony is not merely permitted but required of the plaintiff to meet his burden of proof. Commenting on the rule, Wigmore classifies medical malpractice as an issue of special experience concerning which testimony may be received only of a person of that special experience. * * *. Absent that requirement, a plaintiff would prefer `* * * to rest his case on the mere facts of his sufferings, and to rely upon the jury's untutored sympathies, without attempting specifically to evidence the defendant's unskillfulness as the cause of those sufferings.' Ohio has long followed suit, holding "* * * that expert testimony is ordinarily needed to establish the requisite standard of care and skill a physician owes in his treatment of a patient.' Hoffman v. Davidson (1987), 31 Ohio St.3d 60, 62, 508 N.E.2d 958, 960-61 (citing Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, 346 N.E.2d 673)."
Crosswhite, 64 Ohio App.3d at 174, 580 N.E.2d at 1122 (citations omitted).
Once the plaintiff establishes, through the use of expert testimony, that the defendant-physician failed to adhere to the standard of care, the plaintiff must further demonstrate that the defendant-physician's failure to adhere to the standard of care proximately caused the plaintiff's injuries. See Berdyck,66 Ohio St.3d at 579, 613 N.E.2d at 1021; see, also, Stinson v. England
(1994), 69 Ohio St.3d 451, 633 N.E.2d 532. In Ratliff v. Morehead
(May 19, 1998), Scioto App. No. 97 CA 2505, unreported, this court stated:
 "The plaintiff must present expert testimony on the issue of proximate cause when the causal connection between the negligence and the injury is beyond the common knowledge and understanding of the jury. Berdyck; Bruni; Nichols v. Hanzel (1996), 110 Ohio App.3d 591, 674 N.E.2d 1237. Unless the expert expresses his or her opinion in terms of probability, the testimony will be excluded as speculative. Shumaker v. Oliver B. Cannon Sons, Inc. (1986), 28 Ohio St.3d 367, 504 N.E.2d 44."
Evid.R. 104 (A) provides that preliminary questions concerning the qualification of a person to be a witness must be determined by the court. A trial court's ruling on a witness's qualification or competency to testify as an expert will ordinarily not be reversed on appeal unless there is a clear showing that the court abused its discretion. See Alexander v. Mt. Carmel Med. Ctr.
(1978), 56 Ohio St.2d 155, 383 N.E.2d 564; Ohio Turnpike Comm. v.Ellis (1955), 164 Ohio St. 377, 131 N.E.2d 397. An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. See, e.g., State exrel. Lee v. Montgomery (2000), 88 Ohio St.3d 233, 235,724 N.E.2d 1148, 1150; State ex rel. Duncan v. Chippewa Twp. Trustees
(1995), 73 Ohio St.3d 728, 730, 654 N.E.2d 1254, 1256; State v.Adamson (1998), 83 Ohio St.3d 248, 250, 699 N.E.2d 478, 479. The abuse of discretion standard does not permit the reviewing court to substitute its judgment for that of the trial court's judgment. See, e.g., Chippewa Twp. Trustees,73 Ohio St.3d at 732, 654 N.E.2d at 1258; In re Jane Doe 1 (1991), 57 Ohio St.3d 135,137-38, 566 N.E.2d 1181, 1184.
Evid.R. 702 permits the use of expert testimony and provides as follows:
 A witness may testify as an expert if all of the following apply:
 (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information.
Moreover, in the context of a medical malpractice action, the witness must demonstrate that he or she is familiar with the standard of care applicable to the defendant-physician's school or specialty. As the court explained in Alexander:
 "[T]he witness must demonstrate a knowledge of the standards of the school and specialty, if any, of the defendant physician which is sufficient to enable him to give an expert opinion as to the conformity of the defendant's conduct to those particular standards and not to the standards of the witness' school and, or, specialty if it differs from that of the defendant."
Id., 56 Ohio St.2d at 160, 566 N.E.2d at 567. The witness need not practice in the same specialty as that of the defendant-physician.Id. Rather, "it is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of his qualifications." Id. To qualify a witness who does not practice the same specialty as the defendant, the plaintiff must illustrate that the witness's field of medicine overlaps with that of the defendant and that more than one type of specialist may perform the treatment. Id.,56 Ohio St.2d at 158, 383 N.E.2d at 566 (stating that when "fields of medicine overlap and more than one type of specialist may perform the treatment, the witness may qualify as an expert even though he does not practice the same specialty as the defendant"). As this court explained in Ratliff, supra:
 "The mere fact that a physician is of a different medical specialty than the defendant physician, does not prevent his or her testimony as an expert * * * but an expert witness must have sufficient knowledge, skill, experience, training and education in the subject matter of his or her testimony to satisfy Evid.R. 702."
(citation omitted).
Furthermore, as the Ohio Supreme Court stated in Alexander,56 Ohio St.2d at 159, 383 N.E.2d at 566, an expert witness need only aid the trier of fact in the search for the truth and need not be the best witness on the subject. See, also, Ishler v. Miller
(1978), 56 Ohio St.2d 447, 453, 384 N.E.2d 296, 300 (stating that "the test of admissibility is whether a particular witness offered as an expert will aid the trier of fact in the search of the truth, not whether the expert witness is the best witness on the subject"); Nichols v. Hanzel (1996), 110 Ohio App.3d 591,674 N.E.2d 1237; Lewis v. Lawyer Chiropractic Clinic (Aug. 26, 1999), Scioto App. No. 98 CA 2590, unreported.
In Alexander, the trial court had excluded the plaintiff's expert, a podiatrist, from testifying that: (1) the defendants, orthopedic surgeons, were negligent in failing to remove the plaintiff's cast when the plaintiff complained of pain in her ankle; and (2) the plaintiff's injury resulted from too tight of a cast. The Ohio Supreme Court reversed the trial court's ruling, noting that the application and removal of a cast are not procedures limited to orthopedic surgeons. Id.,56 Ohio St.2d at 158, 383 N.E.2d at 566. The court noted that the plaintiff's expert testified that "in his practice as a podiatrist he has, on a number of occasions, applied a cast to the ankle and that he was specifically instructed in podiatry school as to the method of application." Id. The court further noted that the plaintiff's expert testified that there was a common way all surgeons applied casts and that the principles used in applying the plaintiff's cast were the same as he had been taught. Id. Thus, the court found probative evidence in the record that "there exists a minimum standard of care common to all specialties with regard to the application of casts." Id., 56 Ohio St.2d at 160,383 N.E.2d at 567. Consequently, the Alexander court, finding that the trial court's judgment granting the defendants a directed verdict was premised upon the erroneous exclusion of the plaintiff's expert, reversed the trial court's judgment.
In Ishler, the court held that a doctor who specialized in neurology and psychiatry could testify as to whether an orthopedic surgeon performed unnecessary surgery. The court noted that the doctor had testified that as the attending neurologist, he often worked in conjunction with orthopedic surgeons and that he frequently served as a consultant to orthopedic surgeons attempting to diagnose low back problems. Id.,56 Ohio St.2d at 453, 384 N.E.2d at 300. The court further noted that the record contained evidence that the doctor employed the same diagnostic tools that orthopedic surgeons use and that the doctor demonstrated knowledge of the standards or procedures generally used by orthopedic surgeons in arriving at a decision to perform back surgery. Id. The court thus concluded: "Although [plaintiff's expert] could not have qualified as an expert witness concerning whether [the defendant] properly performed surgery, it is clear that the practical experience gained from his consultations with orthopedic surgeons qualified him to testify regarding the suitability of Ishler for surgery." Id. The court also held that a doctor who specialized in physical medicine and rehabilitation could testify as to the proximate cause of the plaintiff's injury. The court noted that the doctor frequently examined and treated patients who had undergone orthopedic surgery. Id., 56 Ohio St.2d at 454, 384 N.E.2d at 300.
In Steele v. Buxton (1994), 93 Ohio App.3d 717, 639 N.E.2d 861, the expert witness, a general practitioner who was licensed to practice medicine and surgery, testified that he had been trained in medical school on how to perform a herniorrhaphy and that he had assisted in the surgery. He had never performed the surgery himself, however. The court nevertheless found that the expert had sufficient familiarity with the procedure to qualify as a medical expert.
In Berlinger v. Mt. Sinai Med. Ctr. (1990), 68 Ohio App.3d 830,589 N.E.2d 1378, the court held that the trial court erroneously instructed the jury that a medical expert must confine his opinion to matters within his specialty. In Berlinger, the plaintiffs' expert, a perinatologist, testified with respect to the standard of care required of an obstetrician and a gynecologist. The plaintiffs' expert opined that the cause of the child's neurological damage was oxygen deprivation during the course of labor. Id., 68 Ohio App.3d at 834, 589 N.E.2d at 1380. The expert stated that had the defendant doctor, a board certified obstetrician and gynecologist, intervened earlier with a caesarian delivery, the child would not have incurred brain damage at birth. Id. The Berlinger court found that perinatalogy sufficiently overlaps with obstetrics such that the trial court's jury instruction that a medical expert must confine his opinion to matters within his specialty was unnecessary. Id.,68 Ohio App.3d at 835, 589 N.E.2d at 1382. Moreover, the court noted that the doctor had taught medical students and residents obstetrics and gynecology while he was the director of nurseries at a hospital during the late 1970s. Id., 68 Ohio App.3d at 835-36,589 N.E.2d at 1382. See, also, Wells v. Miami Valley Hosp.
(1993), 90 Ohio App.3d 840, 854, 631 N.E.2d 642, 651, jurisdictional motion overruled (1994), 68 Ohio St.3d 1464,627 N.E.2d 1004 (stating that an anesthesiologist and former Director of Obstetrics Anesthesia at the University of Cincinnati was permitted to testify as to the standard of care of an obstetrician when he stated that he regularly worked with and consulted with obstetricians, even though he testified that he was not "familiar with everything an obstetrician does"). See, also, King v. LaKamp (1988), 50 Ohio App.3d 84, 553 N.E.2d 701
(finding that a physician specializing in orthopedic surgery, including foot surgery, was qualified to testify on the procedures employed by the defendant podiatrist because the expert demonstrated sufficient familiarity with those particular procedures); Lewis v. Lawyer Chiropractic Clinic (Aug. 26, 1999), Scioto App. No. 98 CA 2590, unreported (finding that a neurosurgeon demonstrated sufficient familiarity with chiropractors as "primary health care providers" to testify as to standard of care); DiSilvestro v. Quinn (Dec. 31, 1996), Lake App. No. 95-L-061, unreported (finding oncologist qualified to give opinion as to proximate cause and negligence relating to gynecologist's treatment of patient who ultimately was diagnosed with cervical cancer).
In McKinney v. Schlatter (1997), 118 Ohio App.3d 328,693 N.E.2d 1045, the trial court prohibited the plaintiff's expert witness, a cardiovascular thoracic surgeon, from testifying as to the standards of care applicable to cardiologists and emergency room physicians. The court of appeals noted that there was nothing in the record to demonstrate that the expert had any specialized knowledge, skill, experience, training, or education in cardiology or emergency medicine. Id.,118 Ohio App.3d at 338-39, 692 N.E.2d at 1052. The Court stated that "[t]he mere fact that [the doctor] has worked with cardiologists and emergency room physicians in the past does not by itself qualify him to render an expert opinion as to the standards of care applicable to physicians who practice medicine in the specialized fields."Id., 118 Ohio App.3d at 339, 692 N.E.2d at 1052.
In Nichols v. Hanzel (1996), 110 Ohio App.3d 591,674 N.E.2d 1237, discretionary appeal not allowed, (1996),76 Ohio St.3d 1496, 670 N.E.2d 243, the plaintiffs sought to introduce the testimony of a physician who was board-certified in internal medicine and in dermatology that the plaintiff's injury, osteonecrosis (the death of bone tissue), was a proximate cause of the defendants' negligence in prescribing a regimen of corticosteroids. The defendants objected to the testimony, arguing that the doctor was not qualified as an expert in osteonecrosis or orthopedics, which involves the care and treatment of the bone and skeletal system. The trial court prohibited the plaintiffs' expert from testifying as to the cause of the injury because the plaintiffs failed to demonstrate that the doctor's specialties related to osteonecrosis or orthopedics. This court affirmed, noting that the plaintiffs failed to illustrate that their expert possessed specialized knowledge of osteonecrosis other than that the condition is one of the possible side effects of corticosteroids. Moreover, we noted that no evidence existed that the plaintiff's expert had ever received any education or training in orthopedics. Nichols, 110 Ohio App.3d 591,598, 674 N.E.2d 1237. See, also, Hudson v. Arias
(1995) 106 Ohio App.3d 724, 667 N.E.2d 50 (finding that a gastroenterologist was not qualified to testify as to the standard of care applicable to a gynecologist when no evidence that the doctor had previously worked with or consulted with practicing gynecologists).
Thus, a review of the foregoing cases reveals that some combination of the following factors must exist in order to qualify a witness as a medical expert in a medical malpractice case: (1) the witness has had experience working with doctors of the defendant-physician's specialty; (2) the witness has experience, training or familiarity with the procedure or condition at issue; (3) the witness has knowledge of the principles or diagnostic tools applicable to the procedure or condition. Although the witness need not have performed the exact procedure at issue to qualify the witness as an expert, see Ishler; Steele; simply working with doctors in the defendant-physician's specialty ordinarily is not, standing alone, sufficient to qualify the witness as an expert. See McKinney. Rather, the witness also must demonstrate some degree of knowledge, skill, experience, training, or education in the field the witness seeks to evaluate. See McKinney; Nichols.
In the case sub judice, we believe that the record contains sufficient evidence to illustrate that Dr. Maxfield is competent to testify as a medical expert with respect to Dr. Marchyn's adherence to the standard of care and with respect to the proximate cause of appellant's injuries. The case at bar is more similar to the situations present in Alexander, Ishler, Steele, and Berlinger rather than to the situations present in McKinney
and Nichols. Like the expert in Alexander, Dr. Maxfield testified that he has had experience throughout his medical career as to the particular procedure at issue — i.e. when a back brace should be prescribed. Dr. Maxfield stated that during his medical training he received instruction in orthopedics, and that during his internship and during his time in the U.S. Navy, he had occasion to treat patients with traumatic compression fractures to the back.
Dr. Maxfield further stated that he has participated in the treatment of patients with orthopedic problems and that he has worked with orthopedic surgeons in prescribing back braces. Moreover, Dr. Maxfield testified that in his present treatment of his radiation therapy patients, he frequently prescribes braces to protect the integrity of his patients' spines — the same principle at issue with respect to a compression fracture to the back.
Additionally, like the expert in Ishler, Dr. Maxfield stated that he has worked in conjunction with doctors who specialized in Dr. Marchyn's field — orthopedic surgery. Dr. Maxfield also testified that he is familiar with the basic standard of care in orthopedics — to immobilize a fracture. Unlike McKinney andNichols, the record contains ample evidence that Dr. Maxfield had sufficient experience and training in treating compression fractures to the back to render him competent to give an opinion as to whether Dr. Marchyn's treatment of appellant's back fell below the standard of care required of an orthopedic surgeon.
Thus, we believe that the trial court should have permitted Dr. Maxfield to testify as to whether Dr. Marchyn failed to employ that degree of skill, care and diligence that a reasonable orthopedic surgeon would have employed under similar circumstances. The jury then would be free to assign whatever value it deems appropriate to Dr. Maxfield's testimony in light of his medical knowledge and experience. See, generally,Berlinger, 68 Ohio App.3d at 835, 589 N.E.2d at 1381 (stating that differences in areas of specialization go to the weight evidence is to be given by a fact finder).
Moreover, we believe that Dr. Maxfield demonstrated that he possesses sufficient knowledge of orthopedic injuries, specifically injuries to the back, such that he is qualified to testify as to the proximate cause of appellant's injuries. Dr. Maxfield's testimony would have aided the trier of fact in determining the cause of appellant's injuries. See, generally,Ishler, supra; Alexander, supra.
Accordingly, based upon the foregoing reasons, we sustain appellants' second assignment of error.
 III
In their third assignment of error, appellants contend that the trial court erred by granting a directed verdict in favor of appellees. Appellants argue that the trial court erroneously concluded that appellants failed to produce any evidence of proximate cause. Appellants assert that they met their burden through the testimony of Dr. Hauser. Appellants note that Dr. Hauser stated that had Dr. Marchyn prescribed a back brace, appellant's pain could have been alleviated. Appellants additionally argue that the trial court's erroneous decision to prohibit Dr. Maxfield from testifying as to proximate cause was fatal to appellants' case. Appellants contend that had Dr. Maxfield been permitted to testify as to proximate cause, a directed verdict in appellees' favor would have been inappropriate.
Appellees argue that appellants failed to present any evidence that the doctors' treatment of appellant fell below the standard of care or that the alleged failure to properly treat proximately caused appellant's injuries.
In Ramage, 64 Ohio St.3d at 109, 592 N.E.2d at 838, the court set forth the standard for granting a directed verdict. The court stated:
 "The strict standard for granting a directed verdict is found in Civ.R. 50 (A) (4):
 When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue, reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion * * *."
 In Strother v. Hutchinson (1981), 67 Ohio St.2d 282, 284, 423 N.E.2d 467, 469, this court explained this standard:
 `When considering a motion for a directed verdict, a trial court must construe the evidence most strongly in favor of the party against whom the motion is directed. * * *
* * *
 The law in Ohio regarding directed verdicts is well formulated. * * * Thus, `if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied. Kellerman v. J.S. Durig Co. (1964), 176 Ohio St. 320, 199 N.E.2d 562.' Hawkins v. Ivy
(1977), 50 Ohio St.2d 114, 115, 363 N.E.2d 367, 368."
A motion for directed verdict presents a question of law. A court shall not grant a directed verdict when the record contains sufficient evidence going to all the essential elements of the case. Wagner v. Roche Laboratories (1996), 77 Ohio St.3d 116,671 N.E.2d 252. In ruling upon the motion, the trial court may not weigh the evidence. Id. Rather, the evidence must be construed most strongly in favor of the nonmoving party. When substantial evidence supporting the nonmovant's case exists, upon which reasonable minds might reach different conclusions, the trial court must deny the motion. Wells v. Miami Valley Hospital
(1993), 90 Ohio App.3d 840, 631 N.E.2d 642.
A directed verdict is appropriate in a medical malpractice action when the plaintiff fails to present competent expert testimony based upon a reasonable medical probability that the negligent acts of a physician were the direct and proximate cause of the patient's injury. See, generally, Ramage, paragraph four of the syllabus.
In the case at bar, the trial court's directed verdict was premised upon the erroneous exclusion of Dr. Maxfield's testimony on the issue of proximate cause. Had the trial court permitted Dr. Maxfield to testify, a directed verdict would have been inappropriate. See Alexander, supra. Thus, appellant's third assignment of error is well-taken. We decline to address whether the record contains sufficient evidence of proximate cause in the absence of Dr. Maxfield's testimony.
Accordingly, based upon the foregoing reasons, we sustain appellant's third assignment of error. We reverse and remand the trial court's judgment for further proceedings consistent with this opinion.
 JUDGMENT ENTRY
It is ordered that the judgment be reversed and this cause remanded for further proceedings consistent with this opinion. Appellant shall recover of appellee costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Harsha, J. Kline, P.J.: Concur in Judgment Opinion
 _________________________ Peter B. Abele
[1] Throughout the opinion, "appellant" refers to Ronald R. Greene, unless otherwise noted.
[2] Dr. Maxfield stated that hyperbaric medicine is the use of oxygen under increased pressure to promote healing.
[3] Appellants note that the trial court's judgment entry fails to expressly dispose of appellants' consortium claim. Because the consortium claim is derivative in nature, the claim necessarily fails and the trial court's judgment entry need not expressly dispose of the claim. See, generally, Ratliff v. Morehead (May 19, 1998), Scioto App. No. 97 CA 2505, unreported.
[4] Although the parties refer to material attached to appellants' memorandum in opposition, we note that appellants' memorandum in opposition, as it appears in the record, does not have any information attached to it.
[5] The statute provides as follows:
 (1) A hospital shall be presumed to not be negligent in the credentialing of a qualified person if the hospital proves by a preponderance of the evidence that at the time of the alleged negligent credentialing of the qualified person it was accredited by the joint commission on accreditation of health care organizations, the American osteopathic association, or the national committee for quality assurance.
 (2) the presumption that a hospital is not negligent as provided in division (B) (1) of this section may be rebutted only by proof, by a preponderance of the evidence, of any of the following:
 (a) the credentialing and review requirements of the accrediting organization did not apply the hospital, the qualified person, the type of professional care that is the basis of the claim against the hospital.
 (b) The hospital failed to comply with all material credentialing and review requirements of the accrediting organization that applied to the qualified person.
 (c) The hospital, through the medical staff executive committee or its governing body and sufficiently in advance to take appropriate action, knew that a previously competent qualified person with staff privileges at the hospital had developed a pattern of incompetence that indicated that the qualified person's privileges should have been limited prior to treating the plaintiff at the hospital.
 (d) The hospital, through its medical staff executive committee or its governing body and sufficiently in advance to take appropriate action, knew that a previously competent qualified person with staff privileges at the hospital would provide fraudulent medical treatment but failed to limit the qualified person's privileges prior to treating the plaintiff at the hospital.
[6] Prior to House Bill 350, the statute read as follows:
 No hospital, no state or local society, and no individual who is a member or employee of any of the following committees shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of the committee:
 (A) A utilization review committee, quality assurance committee, or tissue committee of a hospital, a not-for-profit health care corporation which is a member of the hospital or of which the hospital is a member, or a community mental health center;
 (B) A board or committee of a hospital or of a not-for-profit health care corporation which is a member of the hospital or which the hospital is a member reviewing professional qualifications or activities of the hospital medical staff or applicants for admission to the medical staff; corporation which is a member of the hospital or which the hospital is a member reviewing professional qualifications or activities of the hospital medical staff or applicants for admission to the medical staff;
 (C) A utilization committee of a state or local society composed of doctors of medicine or doctors of osteopathic medicine and surgery or doctors of podiatric medicine;
 (D) A peer review committee of nursing home providers or administrators;
 (E) A peer review committee, professional standards review committee, or arbitration committee of a state or local society composed of doctors of medicine, doctors of osteopathic medicine and surgery, doctors of dentistry, doctors of optometry, doctors of podiatric medicine, psychologists, or registered pharmacists;
 (F) A peer review committee of a health maintenance organization that has at least a two-thirds majority of member physicians in active practice and that conducts professional credentialing and quality review activities involving the competence or professional conduct of health care providers, which conduct adversely affects, or could adversely affect, the health or welfare of any patient. For purposes of this division, "health maintenance organization" includes wholly owned subsidiaries of a health maintenance organization.
 (G) A peer review committee of any insurer authorized under Title XXXIX [39] of the Revised Code to do the business of sickness and accident insurance in this state that has at least a two-thirds majority of physicians in active practice and that conducts professional credentialing and quality review activities involving the competence or professional conduct of health care providers, which conduct adversely affects, or could adversely affect, the health or welfare of any patient;
 (H) A peer review committee of any insurer authorized under Title XXXIX [39] of the Revised Code to do the business of sickness and accident insurance in this state that has at least a two-thirds majority of physicians in active practice and that conducts professional credentialing and quality review activities involving the competence or professional conduct of a health care facility that has contracted with the insurer to provide health care services to insureds, which conduct adversely affects, or could adversely affect, the health or welfare of any patient;
 (I) A quality assurance committee of a state correctional institution operated by the department of rehabilitation and correction;
 (J) A quality assurance committee of the central office of the department of rehabilitation and correction or department of mental health.
 Nothing in this section shall relieve any individual or hospital from liability arising from treatment of a patient.
 This section shall also apply to any member or employee of a nonprofit corporation engaged in performing the functions of a peer review committee of nursing home providers or administrators or of a peer review or professional standards review committee. No person who provides information under this section and provides such information without malice and in the reasonable belief that such information is warranted by the facts known to him shall be subject to suit for civil damages as a result thereof.
[7] Moreover, we note that House Bill 350 became effective January 27, 1997. The complaint originally was filed on September 26, 1996. Thus, an issue arises as to whether the post-House Bill 350 version of the statute was properly applied to the present case in the first instance.
[8] Evid.R. 103 provides:
 (A) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
* * *
 (2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked. Offer of proof is not necessary if evidence is excluded during cross-examination.
[9] Additionally, Dr. Maxfield testified at his deposition (which is included in the record on appeal) that in his opinion: (1) a brace should have been applied to appellant's back to protect the vertebral bodies and to allow the vertebral bodies to heal properly; and (2) Drs. Marchyn's and Buetne's failure to properly diagnose appellant's injuries resulted in appellant's continued disability.